**In re SFW, INC., d/b/a Seafarms West, Debtor.**

**Bankruptcy No. 87–06429–H12.**

United States Bankruptcy Court, S.D. California.

Feb. 8, 1988.

George P. Mills, San Diego, Cal., for debtor.

Richard A. Solomon, Saxon, Alt, Brewer & Kincannon, La Jolla, Cal., for movant.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

### I.

At issue is whether loans extended by La Jolla Bank and Trust Company ("the Bank") to SFW, Inc., doing business as Seafarms West ("the debtor") for the business operations of the debtor, may be classified as "consumer loans" for the purpose of invoking the co-debtor automatic stay provision of 11 U.S.C. § 1201.

The Bank contends that loans for business purposes are clearly outside the scope of the co-debtor protections of 11 U.S.C. § 1201.

The debtor claims that Congress intended an expansive reading of the term "family farm" such that collection of funds obtained in the furtherance of the primary family purpose—farming—would be subject to the co-debtor stay.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157 and General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

### FACTS

On April 2, 1987, the debtor, a California corporation, while engaged in the business of shellfish cultivation, executed and delivered to the Bank a commercial promissory note in the original principal sum of $60,-681.74. As part of that loan transaction, the debtor also executed and delivered to the Bank a document entitled "Loan Purpose Statement and Distribution Authorization" wherein debtor specifically represented and warranted to the Bank the general purpose of the transaction was for "Business Purposes (including real estate investment)."

On May 5, 1987, the debtor executed and delivered to the Bank a "Commercial Promissory Note" in the original principal sum of $10,000.00. As part of that loan transaction, the debtor also executed and delivered to the Bank a document entitled "Loan Purpose Statement and Distribution Authorization" wherein debtor specifically represented and warranted to the Bank that the general purpose for the loan transaction was for "Business Purposes (including real estate investment)."

As part of the consideration for the loan transactions, on April 2, 1987, Richard D. Glenn, director, president and 51% shareholder of the debtor, executed and delivered to the Bank a "Commercial Guaranty" wherein he guaranteed to the Bank payment of any and all obligations of the debtor to the Bank. To secure payment of the Guaranty, Richard D. Glenn executed and delivered to the Bank assignments of savings account number 05784263–20 with a

balance on April 2, 1987 in the sum of $17,159.07 and hypothecation agreements whereby Richard D. Glenn assigned to the Bank a second deed of trust and note in the sum of $11,500.00.

On April 2, 1987, Elmer F. Glenn and Alice D. Glenn, executed and delivered to the Bank a "Commercial Guaranty" wherein they guaranteed to the Bank payments of any and all obligations of the debtor. To secure payment of the Guaranty, Elmer F. Glenn and Alice D. Glenn, executed and delivered to the Bank hypothecation agreements wherein they pledged to the Bank municipal bonds with a current balance on April 2, 1987 of $46,838.50.

On April 2, 1987, Pamela McBeth and James W. McBeth, holders of forty-five percent of the outstanding common shares of the debtor, executed and delivered to the Bank "Commercial Guarantees" wherein they guaranteed to the Bank payment of any and all obligations of the debtor to the Bank.

The debtor defaulted in the payments due under the commercial promissory notes, and pursuant to the terms of the notes, the entire balance in the sum of $69,255.31, plus accrued interest, late charges, and other costs and expenses became due and payable to the Bank. Pursuant to the terms of the commercial guarantees, demand was made by the Bank on the co-debtors to pay the sum of $69,255.31.

On September 1, 1987, the debtor filed its petition under Chapter 12 of the Bankruptcy Code. On September 24, 1987, the Bank sent notice to all co-debtors that the commercial promissory notes were in default and that the principal sum of $69,255.31 plus interest and other charges and expenses were due and payable to the Bank by the co-debtors. In response to the demand letters, the Bank's counsel was contacted by counsel representing the debtor and informed of his contention that the co-debtors were protected by the co-debtor stay as set forth in 11 U.S.C. § 1201, in that the debt in question was a "consumer debt." On November 13, 1987, the Bank filed motion for relief from stay to permit action against the co-debtors. Opposition to the Bank's motion was received on December 2, 1987, and a hearing was scheduled for December 16, 1987. At the hearing on the Bank's motion on December 16, 1987, this court requested supplemental briefing on the applicability of § 1201 to the co-debtors in question.

The Bank contends that (1) the legislative history and intent behind the enactment of Chapter 12 establishes that the indebtedness due and owing to the Bank was not meant or intended to fall within the definition of a "consumer debt," and therefore is not within the protection of 11 U.S.C. § 1201 co-debtor stay; (2) that the definition of "consumer debt" is controlled by case law and decisions analyzing and determining the co-debtor stay of 11 U.S.C. § 1301; (3) that the intent of the parties in entering into the transactions in question is a substantial factor in determining whether the indebtedness is a business or consumer debt; (4) that the debtor's definition of "consumer debt" is overly broad and goes beyond the intent of the legislature in enacting Chapter 12 bankruptcy provisions; and (5) the debtor's operation is not a farming operation which may utilize a Chapter 12 petition.

The debtor claims that since 11 U.S.C. § 101(7) defines a "consumer debt" as a debt incurred primarily for "a personal, family, or household purpose," and since the obligations with respect to which the Bank wishes to obtain relief from stay were incurred in furtherance of and for the purpose of the family farming operations of the debtor, the obligations should be deemed to be obligations incurred for "a family" purpose under § 101(7).

## DISCUSSION

Chapter 12 was enacted to address the unique problems faced by family farmers seeking protection under the Bankruptcy Code. Chapter 12 is an emergency effort to relieve the traditional family farmer of the hardships which have fallen upon his shoulders due to the current economic crisis faced by the traditional family farmer. Public Law No. 99–554 contains the over-

view and legislative intent behind the enactment of Chapter 12:

> Under current law, family farmers in need of financial rehabilitation may proceed under Chapter 11 or Chapter 13 of the Bankruptcy Code. Most family farmers have too much debt to qualify as debtors under Chapter 13 and are thus limited to relief under Chapter 11. Unfortunately, family farmers have found Chapter 11 needlessly complicated, unduly time consuming, inordinately expensive, and, in too many cases, unworkable.

> Accordingly, this subtitle creates a new Chapter of the Code—Chapter 12—to be used only by family farmers. It is designed to give family farmers facing a bankruptcy a fighting chance to reorganize their debts and keep their land. It offers family farmers important protection from creditors that bankruptcy provides while, at the same time, preventing abuse of the system and insuring that farm lenders receive a fair repayment.

> *This new Chapter is closely modeled after existing Chapter 13. At the same time, however, the new Chapter alters those provisions that are inappropriate for family farmers—the requirement that the plan be filed within fifteen days of the petition; the requirement that the plan's payments start within thirty days of the plan confirmation; and the low debt limits found in Chapter 13.*

> Under this new Chapter, it will be easier for a family farmer to conform a plan of reorganization (emphasis added).

Conference Report and Statement on H.R. 5316 (P.L. 99–554), App. 3, *Collier on Bankruptcy,* XXII–5 (15th ed. 1987) ("The Conference Report").

■ The legislative intent that Chapter 13 case law control interpretation of Chapter 12 provisions which are nearly identical in substance is clear. Furthermore, the above legislative history exerpt clearly states that the provisions of Chapter 13 which were deemed inappropriate for family farmers were altered in drafting Chapter 12. An in-depth discussion of 11 U.S.C. §§ 1204, 1205, 1206, 1224, 1225 and 1227 appears in the Conference Report, which thoroughly discusses the impact of these modified sections. However, nowhere in the Conference Report is there any indication that § 1201 was intended to be interpreted differently than § 1301. The text of § 1201 and § 1301 are virtually identical. Therefore, the conclusion that Congress intended the courts to apply the existing case law of § 1301 to disputes arising under § 1201 is inescapable. This conclusion is supported by all published case law considering the matter. *In re Robinson Ranch,* 75 B.R. 606, 611 (Bankr.D.Mont.1987); *In re Bigalk,* 75 B.R. 561, 565 (Bankr.D.Minn. 1987); *See also, In re Circle Five, Inc.,* 75 B.R. 686, 16 B.C.D. 211 (Bankr.D.Idaho 1987).

In analyzing the debtor's claim that the co-debtor stay applies to the guarantees in question, a number of problems arise. Most notable among these are: (1) the guarantor's involved do not qualify as co-debtors; (2) the loans guaranteed were not consumer debt; and (3) corporations cannot incur consumer debt.

■ The guarantors for whom the debtor seeks protection under the § 1201 co-debtor stay are Richard D. Glenn, Elmer F. Glenn, Alice D. Glenn, Pamela McBeth and James W. McBeth. All but Elmer F. Glenn and Alice D. Glenn are shareholders of the debtor.

Congress clearly intended [§ 1301] to afford relief to a debtor by depriving a creditor of the considerable extra-judicial pressure which could be brought to bear toward surrender of collateral, reaffirmation or other realization on debt, by continuing concerted collection action against an "innocent" third party co-obligor not in bankruptcy. The legislative history ... makes it clear that Congress did not intend to allow the co-obligor stay to be asserted by a co-obligor who in fact received the consideration for the debt. *In re Cooper,* 3 B.R. 246, 248 (Bankr.S. D.Cal.1980); *In re Johnson,* 1 C.B.C.2d 547, 548 (Bankr.W.D.N.Y.1980). Obviously, Congress sought to stay collection only against co-obligors who extended their credit as a family or a personal

accommodation to the obligor who actually received the benefits of the extension of credit.

*In re Bigalk,* 75 B.R. at 565–66.

The loans guaranteed by the shareholders clearly were for their own benefit—the continuance of the family farm. While it is true that the debtor herein is a corporation, and that sums borrowed by the corporation accrue to the corporation, the primary beneficiaries of corporate borrowing are the shareholders of the corporation. Therefore, the shareholders cannot be classified as innocent co-obligors extending family or personal obligations. Rather, these transactions represent a shareholder infusion of capital into their business.

■ Second, and more importantly, the guarantees involved do not relate to a consumer debt. Consumer debt is defined by the Bankruptcy Code as debt incurred for "a personal, family or household purpose." 11 U.S.C. § 107(7). "An extension of credit for the commencement or continuation of large-scale agriculture or business activity is simply not made for a personal, family or household purpose." *In re Bigalk,* 75 B.R. at 566. In considering a similar question, the Eight Circuit opined that a family farmer cannot hold two hundred little pigs for a "personal family or household use" within the meaning of 11 U.S.C. § 522(f)(2)(A). *In re Thompson,* 750 F.2d 628 (8th Cir.1984) (hog-raising is a capital business venture, for which financing does not consist of consumer debt).

The debtor admits that the loans guaranteed were applied to the family farming operations of the debtor. By definition, at least eighty percent of the debtor's gross income must come from these farming operations. 11 U.S.C. § 101(19). Combining these two considerations, it is self-evident that the debtor undertook the loans to enhance the profit making potential of its family farming operations. "Where the debtor's entry into a credit transaction is motivated by a desire for business profit, the debt created thereby cannot be classified as consumer debt." *In re Almendinger,* 56 B.R. 97, 99 (Bankr.N.D.Ohio 1985); *In re Bigalk,* 75 B.R. at 566; *In re Circle*

*Five, Inc.,* 75 B.R. 686, 16 B.C.D. 211 (Bankr.D.Idaho 1987). Therefore, the codebtor stay does not protect the guarantors of the debtor's loan with the Bank.

■ Finally, the term "consumer debt" derives from the definition used in various consumer protection laws. *In re Kelly,* 70 B.R. 109, 112 (9th Cir. BAP 1986); *In re Bernstein,* 71 B.R. 259, 260 (Bankr.S.D.Fla. 1987); *In re Constantino,* 72 B.R. 189, 192 (Bankr.D.S.C.1986). The definition of consumer debt in 11 U.S.C. § 101(7) comes from the definition of consumer goods set out in the Uniform Commercial Code. *In re Constantino,* 72 B.R. at 192. The factor which distinguishes non-consumer goods from consumer goods "is the use of goods in production of income, as opposed to normal consumptive activity by an *individual.*" *In re Constantino,* 72 B.R. at 192; *In re Circle Five, Inc.,* 75 B.R. 686, 16 B.C.D. at 212 (emphasis added). The debtor herein is a corporation. The Code defines "person" as an individual, partnership or corporation. 11 U.S.C. § 101(35). The definition of corporation given in 11 U.S.C. § 101(8) does not include individuals. Therefore, a corporation is not an individual within the meaning of the Code and cannot incur a consumer debt. *In re Circle Five, Inc.,* 75 B.R. 686, 16 B.C.D. at 212.

■ Debtor argues that to give true effect to Chapter 12's protections of family farmers, it is necessary to construe the words "family purpose" from the definition of "consumer debt" as applying to the family farming operation, because farming is the "family purpose." Debtor goes on to claim that any loans which went toward either the personal, family or household use of the debtor or the debtor's farming business would be covered within the umbrella of § 1201. Only debts incurred for non-farming business or other non-farming purposes would be outside the scope of the § 1201 stay. This position is completely untenable. First, if debtor were correct, there would be no reason why such an argument would not be equally applicable to § 1301, where the obligor guaranteed obligations which went toward a "family

business" owned by the Chapter 13 debtor. Secondly, while there may be a linguistic beauty to using the common word "family" from "family purpose" and "family farm" to transmogrify a commercial loan into a consumer loan, the result is as incongruous as it is dangerous to the commercial lending industry and the family farmer. If § 1201 were allowed to protect guarantors of loans undertaken for business purposes, the end result would be that the additional risk to which lenders would be exposed would drive up interest rates for farm loans. While this may spread the cost of bankruptcy more uniformly among farmers as a whole, there is no evidence in the legislative history supporting Congress' intent to adopt such a redistribution theory. Clearly, Congress *did not intend* to raise the costs of borrowing funds for farmers when it enacted Chapter 12.

## CONCLUSION

The co-debtor stay of § 1201 does not apply to the co-debtors who guaranteed commercial loans undertaken by the debtor for the business purposes of the family farm.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Bankr.R. 7052. Counsel for the Bank is directed to file with this court an Order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.