**CECO Corporation, Plaintiff and Appellant,**

**v.**

**CONCRETE SPECIALISTS, INC., a Utah corporation, et al., Defendants and Appellees.**

**BLUMENTHAL BROTHERS, INC., a Utah corporation, and Industrial Indemnity Company, a California corporation, Cross–Claimants and Third–Party Plaintiffs,**

**v.**

**STANSBURY MINING CORPORATION, a Utah corporation, Victor Borcherds, and John Does and Jane Roes, numbers 1 through 15, Cross–Defendants and Third–Party Defendants.**

No. 19769.

Supreme Court of Utah.

April 11, 1989.

George M. Haley, Robert H. Rees, Salt Lake City, for plaintiff and appellant.

William T. Thurman, David W. Slaughter, John G. Marshall, Kenton W. Willis, David E. Leta, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice:

Plaintiff CECO Corporation appeals from a trial court's grant of summary judgment dismissing its action against third-party plaintiff Blumenthal Brothers, Inc. CECO claims that the trial court erred in holding that CECO was estopped from asserting its claim against Blumenthal. Blumenthal cross-appeals from the trial court's dismissal of its third-party action for indemnification against Stansbury Mining Corporation, Victor Borcherds, and others. In the event that this Court reverses the trial court's grant of summary judgment, Blumenthal seeks reinstatement of its third-party claim. We reverse the trial court's dismissal of CECO's claim against Blumenthal and of Blumenthal's indemnification action against the third-party defendants.

This case was presented to the trial court on stipulated facts, which are summarized below. In November of 1980, Blumenthal signed a contract with the Board of Education of the Murray School District. Blumenthal was to act as general contractor for the construction of an addition to the Murray High School gymnasium. Blumenthal posted a 100 percent labor and materials payment bond with the School District, as required by sections 53–11–1 and 63–56–38 of the Utah Code.[1] In December of 1980, Blumenthal subcontracted the concrete work on the project to Concrete Specialists, Inc. ("CSI"), which did not post a bond. In January of 1981, CSI sub-subcontracted a portion of its work to CECO. CECO fully performed its work under the CSI/CECO contract between May and August of 1981.

Blumenthal made periodic payments to CSI as construction progressed. By Au-

---

1. Section 53–11–1 provided that whenever a new school was to be built or an alteration made to any existing school and the estimated cost was more than $20,000, the contractor to whom the school board awarded the bid was required to post a 100 percent full performance bond in the amount of the contract price and a 100 percent full payment bond. Utah Code Ann. § 53–11–1 (1981). This provision, as well as the rest of title 53, was repealed by 1987 Utah Laws ch. 167, § 171, effective April 27, 1987, and 1988 Utah Laws ch. 2, § 345, effective February 2, 1988. Section 53A–20–101 of the Code is the current equivalent of section 53–11–1, and it provides, among other things, that a successful bidder on a school building project post payment and performance bonds as required by section 63–56–38 of the Code. Utah Code Ann. § 53A–20–101 (1989); Utah Code Ann. § 63–56–38 (Supp.1988).

The current language of section 63–56–38 is, with minor exceptions, the same as it was in 1981. The statute provides, in pertinent part:

(1) When a construction contract is awarded, the following bonds or security shall be delivered to the state and shall become binding on the parties upon the execution of the contract:

(a) a performance bond satisfactory to the state, in an amount equal to 100% of the price specified in the contract, executed by a surety company authorized to do business in this state or any other form satisfactory to the state; and

(b) a payment bond satisfactory to the state, in an amount equal to 100% of the price specified in the contract, executed by a surety company authorized to do business in this state or any other form satisfactory to the state, *for the protection of all persons supplying labor and material to the contractor or its subcontractors for the performance of the work provided for in the contract.*

. . . .

(3) *Any person who has furnished labor or material to the* contractor or *subcontractor* for the work provided for in the contract, in respect of which a payment bond is furnished under this section, *who has not been paid* in full therefor within 90 days from the date on which the last of the labor was performed by him or material was supplied by him for which the claim is made, *may sue on the payment bond* for any amount unpaid at the time the suit is instituted and may prosecute the action for the amount due him [or her]. Any person having a contract with a subcontractor of the contractor, but no express or implied contract with the contractor furnishing the payment bond, has a right of action upon the payment bond upon giving written notice to the contractor within 90 days from the date on which such person performed the last of the labor or supplied the last of the material for which the claim is made. The person shall state in the notice the amount claimed and the name of the party for whom the labor was performed or to whom the material was supplied. The notice shall be served by registered or certified mail, postage prepaid, on the contractor at any place the contractor maintains an office or conducts business.

Utah Code Ann. § 63–56–38 (Supp.1988) (emphasis added).

For the purposes of § 63–56–38, "state" means "local public procurement unit," which includes school districts. Utah Code Ann. §§ 63–56–2(3), 63–56–5(12) (1986).

gust of 1981, CSI had received approximately $180,000 from Blumenthal, but had not paid CECO anything. Therefore, during the first week of August of 1981, James Trenam, CECO's district manager, telephoned William H. Blumenthal, Vice–President of Blumenthal. Trenam asked Blumenthal if any payments had been made to CSI, notified him that CSI had not yet paid CECO for the work it had performed, and asked Blumenthal if he could put some pressure on CSI to pay CECO. Blumenthal responded that he had made regular payments to CSI and that he would attempt to help CECO. He offered to make checks for CSI's next payments payable jointly to CSI and CECO. Trenam replied that CSI had agreed to pay CECO on August 14, 1981, and asked Blumenthal to refrain from making a payment to CSI until after that date. Blumenthal complied with this request.

On August 19, 1981, Trenam called William Blumenthal again. Trenam notified Blumenthal that CECO had received payment from CSI on its first invoice and that, although CSI still owed CECO approximately $21,500 on subsequent invoices, CSI had represented that it would pay this amount to CECO. Trenam stated that it appeared it would not be necessary for Blumenthal to pay CSI by checks jointly payable to CSI and CECO in order to ensure CECO's being paid, that Blumenthal should go ahead and pay CSI in the ordinary way as it had in the past, as is the custom in the industry, and that CECO would continue to seek payment directly from CSI. Blumenthal subsequently paid CSI $16,020 on August 20, 1981, and $9,630 on September 25, 1981, without making the checks jointly payable to CSI and CECO. Sometime in September, CSI failed to perform further on its contract with Blumenthal. CSI also failed to make any more payments to CECO and eventually filed a petition in bankruptcy. On November 4, 1981, CECO notified Blumenthal in writing of CSI's payment default, as required by Blumenthal's payment bond and informed Blumenthal that it was making a claim for $25,399.70 as amounts due but unpaid from CSI. Trenam also telephoned William Blumenthal on December 16, 1981, and personally informed him that CSI had made no payments after August 19, 1981. Blumenthal replied that Blumenthal did not owe any further sums to CSI and therefore could not help CECO with checks made jointly payable to CSI and CECO.

CECO instituted this action against Blumenthal and its indemnity bond carrier. The trial court granted Blumenthal summary judgment. It held that because Trenam refused Blumenthal's offer to issue checks to CSI made jointly payable to CSI and CECO, permitted Blumenthal to pay CSI directly, and represented that it would look to CSI for payment, CECO was estopped from later asserting a claim against Blumenthal for sums that would be otherwise due under the bond. On appeal, CECO argues that the trial court erred in holding that it was estopped. CECO contends that the facts essential to create an estoppel defense are missing.

The standard of review when considering a challenge to a summary judgment is settled. A grant of summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *see, e.g., Geneva Pipe Co. v. S & H Ins. Co.,* 714 P.2d 648, 649 (Utah 1986). And in deciding whether the trial court properly granted judgment as a matter of law to the prevailing party, we give no deference to the trial court's view of the law; we review it for correctness. *See Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 887 (Utah 1988); *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). Here, because there is no dispute as to the facts, we are faced with a purely legal question: Do the facts show estoppel?

■ Estoppel is an equitable defense that requires proof of three elements: (i) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (ii) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement,

admission, act, or failure to act; and (iii) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act. *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 602 P.2d 689, 694 (Utah 1979); *see also Blackhurst v. Transamerica Ins. Co.,* 699 P.2d 688, 691 (Utah 1985); *United American Life Ins. Co. v. Zions First Nat'l Bank,* 641 P.2d 158, 161 (Utah 1982); *J.P. Koch, Inc. v. J.C. Penney Co.,* 534 P.2d 903, 905 (Utah 1975).

■ CECO first contends that the facts essential to show the first element of an estoppel defense are not present, to wit: CECO has not been shown to have said or done anything that is inconsistent with its assertion that it is entitled to collect the unpaid amounts from Blumenthal on the bond. Trenam, in his August 19, 1981 conversation with Blumenthal, declined Blumenthal's offer to make CSI's payments by checks made jointly payable to CSI and CECO, stating that such act was not necessary since CSI had just made a partial payment and had assured CECO that it would pay the remaining amounts due. Trenam also said that CECO would seek payment directly from CSI for the remaining amounts owed and that Blumenthal should pay CSI directly, as was the normal custom in the construction industry. However, Trenam never stated that CECO would not seek payment from Blumenthal if CSI failed to pay what remained due. CECO never expressly waived its rights under the material and performance bond and, in fact, notified Blumenthal of CSI's default in the fashion required by the Code. Since CECO neither expressly waived its rights under the bond nor represented that it would not seek payment from Blumenthal, CECO's subsequent suit was not inconsistent with its earlier statements to Blumenthal, and the first element of estoppel has not been proven.

The public policy underlying performance bond statutes also militates against a finding of estoppel on these facts. Those who do work for and provide materials to private building and construction contrac-

tors ordinarily are protected against their contractors' defaults by the availability of mechanic's liens on the project to which the work or materials flowed. *See generally* Utah Code Ann. §§ 38–1–1 to –26 (1988). This protection is not available to those involved in public construction projects. Utah Code Ann. § 38–1–1 (1988). Therefore, performance bonds are required on public projects to provide substitute protection for laborers and material providers. *See Equitable Sur. Co. v. United States,* 234 U.S. 448, 456, 34 S.Ct. 803, 805, 58 L.Ed. 1394 (1914); Annotation, *Right of Person Furnishing Material or Labor to Maintain Action on Contractor's Bond to Owner or Public Body, or on Owner's Bond to Mortgagee,* 77 A.L.R. 21, 83–89 (1932); 17 Am.Jur.2d *Contractors' Bonds* § 44 (1964). The Utah performance and payment bond statute expressly reflects this purpose when it states that a 100 percent payment bond shall be executed *"for the protection of all persons supplying labor and material* to the contractor or its subcontractors for the performance of the work provided for in the contract." Utah Code Ann. § 63–56–38(1)(b) (Supp.1988) (emphasis added). If we were to hold that a sub-subcontractor is estopped from pursuing a bond claim when it notifies the general contractor that a subcontractor owes it money but that the sub-subcontractor will continue to look to the subcontractor for payment, as is the industry custom, the statutory policy of requiring payment and performance bonds would be seriously undermined. The result would be to make it rather easy for general contractors to avoid their statutory obligation to provide assurances that their subcontractors will pay their bills. To find estoppel in this situation produces a ludicrous result: a sub-subcontractor who makes the general contractor aware of possible payment problems with a subcontractor, but still looks to that immediate subcontractor for payment cannot collect against the bond; whereas a sub-subcontractor with payment problems who says nothing can proceed against the bond.

The trial court's dismissal of CECO's claim against Blumenthal is reversed, as is

its dismissal of Blumenthal's indemnification action against the third-party defendants.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.