**FIRST SECURITY BANK OF UTAH, National Association, a national banking association, Plaintiff and Appellant,**

v.

**Orville L. CREECH, Ruby E. Creech, Larry O. Creech, Joann Creech, and Walter Herbert Creech, Defendants and Appellees.**

No. 910149.

Supreme Court of Utah.

March 3, 1993.

Rehearing Denied Sept. 23, 1993.

James Z. Davis, Ogden, for First Sec. Bank.

Steven W. Dougherty, Linda M. Jones, Salt Lake, for Orville and Ruby Creech.

Lyle W. Hillyard, Logan, for Joann, Larry & Walter Creech.

ZIMMERMAN, Justice:

First Security Bank appeals an interlocutory order denying its motion for partial

summary judgment and granting a cross-motion for partial summary judgment filed by Orville and Ruby Creech ("the elder Creeches") and their three children, Larry Creech, Joann Creech, and Walter Creech ("the younger Creeches"). First Security challenges the trial court's ruling that neither the elder Creeches nor the younger Creeches defaulted on their loan agreements with the bank when the elder Creeches filed for bankruptcy and failed to make repayments during the period between the bankruptcy filing and the confirmation of the elder Creeches' bankruptcy plan. First Security also challenges the trial court's decision to reserve ruling on First Security's request for attorney fees. We affirm in part and reverse in part.

The facts are not in dispute. In February of 1986, the elder Creeches entered into a series of loan agreements with First Security to fund the continued operation of their dairy farm. Larry and Joann Creech provided some of the collateral and served as guarantors on one of the loans, a commercial note. Walter Creech served as a guarantor on another loan, a promissory note pursuant to an agricultural credit and security agreement. All the loan agreements included a provision, referred to as an "ipso facto clause," which specified that the bank could hold the Creeches in default, accelerate their monthly payments, and take immediate possession of the collateral if they filed for bankruptcy. The loan agreements also specified that the Creeches could be held in default if they failed to make the payments.

In November of 1986, the elder Creeches filed for chapter 12 bankruptcy protection and stopped making payments. During the bankruptcy proceedings, the elder Creeches and the bank entered into a stipulation that required the elder Creeches, among other things, to maintain their dairy herd at a minimum size, to maintain a certain average level of milk production, and to provide the herd with regular veterinary inspection and treatment. The stipulation provided that if the elder Creeches failed to meet these requirements, First Security would be given relief from the automatic stay imposed by the Bankruptcy Code, see 11 U.S.C. § 362, and could foreclose under the loan agreements. The stipulation further allowed the elder Creeches to make lower monthly payments than those specified in the loan agreements.

The stipulation was incorporated into the elder Creeches' reorganization plan, which was confirmed by an amended order of the bankruptcy court on July 8, 1987. On July 20, 1987, the bankruptcy court issued another order, modifying the confirmed plan and stipulation for reasons not relevant here. Thereafter, the elder Creeches commenced making monthly payments to First Security in the amounts specified by the stipulation.

In May of 1988, while the elder Creeches' bankruptcy action was still pending, First Security brought a foreclosure action in state district court, alleging that both the elder and the younger Creeches were in default under the stipulation because they failed to maintain the size of their herd, to maintain milk production at the specified level, and to provide necessary veterinary care. Because of this default, the bank claimed that it could proceed against the Creeches under the original loan agreements. The Creeches filed an application to remove the state court action to the bankruptcy court, but the bankruptcy court denied the application, reasoning that the issue of whether the Creeches had defaulted under the terms of the stipulation was appropriately before the state court.

In November of 1989, before the state district court took any action in the foreclosure case, the bankruptcy court dismissed the elder Creeches' chapter 12 case without prejudice. It found that the elder Creeches had not adhered to their confirmed bankruptcy plan in that they had failed to make required payments to another creditor.

In March of 1990, First Security moved for partial summary judgment in the foreclosure action. It contended that the stipulation, bankruptcy plan, and order confirming the plan controlled the rights and duties of the parties and that under one or more of these, the Creeches had defaulted

as a matter of law, allowing it to proceed against all the Creeches. The bank also argued that damages caused by the breach could be determined as a matter of law from the evidence before the court. In response, the elder Creeches filed a cross-motion for partial summary judgment, asking the court to determine that the stipulation, bankruptcy plan, and order confirming the plan could not be enforced because the underlying bankruptcy proceedings had been dismissed. The elder Creeches further contended that the original loan documents controlled and defined the relationship of the parties, except to the extent that the payment schedule had been modified by the stipulation.

The trial court ruled in favor of the Creeches, finding that the stipulation and "resulting order" from the bankruptcy court were unenforceable because they "were not freely negotiated at arms length, and did not result in an [o]rder which otherwise could be enforceable outside the framework of bankruptcy." The court found further that the original loan agreements "were in force and effect and the period of the bankruptcy shall not be considered to be a breach of the original terms and provisions." The court stated that the payments made during the bankruptcy period "should be applied against the whole obligation" and that the Creeches "under this formula, will be obliged to eventually make up the difference." The court reasoned that the parties should be returned to the same positions they had occupied prior to the bankruptcy filing, but cited no legal authority for this conclusion. The court only stated that it was relying on "principles of equity and law" with "perhaps the former overriding the latter."

After the trial court issued its memorandum decision, First Security made a "motion for clarification." It argued that the trial court incorrectly "assumed that, under the provisions of the Bankruptcy Code, the filing of a bankruptcy or any other default that may have occurred as a result of or during the course of a bankruptcy could not, as a matter of law, constitute a breach." First Security also contended that if it was the trial court's intent to apply equity, at a minimum the bank should be awarded attorney fees and costs. After a hearing, the trial court reaffirmed its previous decision and said that it was explicitly reserving the issue of attorney fees and costs for a later hearing. First Security then petitioned this court for interlocutory review, which we granted.

On appeal, the bank does not challenge the trial court's conclusion that the stipulation and "resulting order" are void. Although the trial court's ruling is unclear as to which "order" it was referring, it is apparent from the court's findings and the parties' contentions in their cross-motions for summary judgment that the court believed that *any* bankruptcy court orders recognizing the stipulation were unenforceable. Because First Security does not dispute the trial court's determination on this point, we do not review the correctness of this view of the law. Consequently, we treat the stipulation, confirmed plan, and associated bankruptcy court orders, to the extent they control the relationship between the elder Creeches and the bank, as having no effect.

First Security initially argues that the trial court erred in ruling on the parties' rights and duties under the loan agreements because neither party had requested that the court reach that issue. In making this claim, the bank presents no analysis or reasoning and cites no authority. Rule 24(a)(9) of the Utah Rules of Appellate Procedure states that the parties' briefs to this court "shall contain the contentions and reasons of the appellant with respect to the issues presented, with citations to the authorities, statutes, and parts of the record relied on." Utah R.App.P. 24(a)(9). First Security has not complied with this rule. Absent a compelling reason why we should waive application of rule 24(a)(9), we do not address this contention.

First Security's principal argument is that the trial court erred in finding that both the elder and younger Creeches were not in default under the loan agreements. Specifically, the bank challenges the court's determination that no default oc-

curred when the elder Creeches filed for bankruptcy or when any of the Creeches failed to make payments during the eight-month period between the bankruptcy filing and the confirmation of the elder Creeches' bankruptcy plan.

▮ We first state the standard of review. We review a summary judgment for correctness, affording no deference to the trial court's legal conclusions. *Allen v. Prudential Property & Casualty Ins. Co.,* 839 P.2d 798, 800 (Utah 1992); *Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989) (per curiam). On the other hand, we can rely on any basis having support in the record to affirm. *Allen,* 839 P.2d at 800; *College Irr. Co. v. Logan River & Blacksmith Fork Irr. Co.,* 780 P.2d 1241, 1244 (Utah 1989).

▮ Turning to the merits, we first review the bankruptcy law framework within which this case is necessarily considered. By filing a petition under chapter 12 of the Bankruptcy Code, the elder Creeches placed all their legal and equitable interests in the bankruptcy estate, referred to as "property of the estate" under the Bankruptcy Code. 11 U.S.C. § 541(a); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983); *In re Plata,* 958 F.2d 918, 920 (9th Cir.1992). Although their property became vested in the bankruptcy estate, they were entitled to, and did, remain in possession of the estate and continue to operate their dairy business. *See* 11 U.S.C. §§ 1203, 1207(b); *see also In re Plata,* 958 F.2d at 920.

▮ The Bankruptcy Code provides that confirmation of a reorganization plan under chapter 12 revests the property of the estate in the debtor except as provided by the plan. *Id.* § 1227(b). Here, the bankruptcy court did confirm the elder Creeches' reorganization plan, which incorporated the stipulation. However, the state trial court found the stipulation and any bankruptcy court orders recognizing the stipulation to be unenforceable, and the parties do not dispute this ruling. Consequently, the parties are precluded from ar-

guing that the confirmed plan in any way controls their rights. Thus, for the narrow purpose of resolving this case, we treat the confirmation as if it was wholly ineffectual. This leads to the conclusion that the property of the estate did not revest upon confirmation of the plan.

▮ What happened to the elder Creeches' bankruptcy estate hinges on the effect of section 349(b)(3) of the Bankruptcy Code. This section provides that a dismissal of the bankruptcy case automatically "revests property of the estate in the entity in which such property was vested immediately before the commencement of the case." *Id.* § 349(b)(3). Under this statute, the property of the estate revested in the elder Creeches upon the dismissal of their case. The question we must now decide is whether the divestiture of their property that occurred upon filing for bankruptcy and the revesting that occurred as a result of the bankruptcy dismissal affected the obligations of the elder Creeches under the terms of the original loan agreements.

▮ We are of the view that any contract rights held by the elder Creeches under the original loan agreements became property of the estate when they filed for bankruptcy and were then revested in the elder Creeches when their bankruptcy case was dismissed. This view is supported by section 541(a) of the Bankruptcy Code, which defines "property of the estate" as all legal and equitable interests of the party filing for bankruptcy. Furthermore, the legislative history of this statute indicates that the scope of this definition is broad: "It includes all kinds of property, including tangible or intangible property." S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868; *see also Whiting Pools,* 462 U.S. at 204–05 & n. 9, 103 S.Ct. at 2313–14 & n. 9. This provision has been interpreted as "all-inclusive," *In re Minoco Group of Cos.,* 799 F.2d 517, 518 (9th Cir.1986), and "sweeping," *In re Goff,* 706 F.2d 574, 578 (5th Cir.1983). One court has noted that "an interest is not outside its reach because it is novel or contingent or enjoyment must be postponed." *In re Minoco Group,* 799

F.2d at 518. Consistent with this broad definition of "property of the estate," courts generally have held it to include whatever contract rights the debtor holds when the bankruptcy petition is filed. *See, e.g., A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Computer Communications, Inc.,* 824 F.2d 725, 729 (9th Cir.1987).

The contract rights held by the elder Creeches under the original loan agreements at the time of the bankruptcy filing included the right to continue to own and enjoy the collateral securing the loans so long as the terms of the loan agreements were fulfilled. When the elder Creeches filed for bankruptcy, this right and others held by the elder Creeches under the loan agreements became property of the estate. *See* 11 U.S.C. § 541(a); *A.H. Robins Co.,* 788 F.2d at 1001; *In re Computer Communications,* 824 F.2d at 729.

It may be argued that when the Creeches filed for bankruptcy, a default automatically occurred by reason of the ipso facto clauses in the loan agreements and that the default divested the elder Creeches of the right to continue to own and enjoy the collateral before the bankruptcy estate came into being. Under this theory, this and other rights contingent on the elder Creeches' performance under the loan agreements could not have vested in the bankruptcy estate because the elder Creeches no longer were entitled to them. This argument is untenable. Section 541(c)(1)(B) of the Bankruptcy Code provides, inter alia, that "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement ... that is conditioned on the insolvency or financial condition of the debtor [or] on the commencement of a case under [title 11 of the United States Code]." 11 U.S.C. § 541(c)(1)(B). This provision rendered the ipso facto clauses in the loan agreements ineffective.

Having found that the elder Creeches' contract rights under the loan agreements vested in the bankruptcy estate upon filing, it follows that those rights were revested in the elder Creeches when their bankruptcy case was dismissed under section 349(b)(3) of the Bankruptcy Code. Thus, even if the elder Creeches defaulted under the original agreements by filing for bankruptcy or failing to make payments during the bankruptcy—thereby losing their rights under the loan agreements and giving First Security the opportunity to foreclose—section 349(b)(3) returned the elder Creeches to the same position they occupied prior to filing the petition. *Cf. In re Nash,* 765 F.2d 1410, 1414 (9th Cir.1985) ("[Section] 349 'obviously contemplates that on dismissal a bankrupt is reinvested with the estate, subject to all encumbrances which existed prior to the bankruptcy.'" (quoting *In re Income Property Builders, Inc.,* 699 F.2d 963, 965 (9th Cir. 1982) (per curiam))).

Our conclusion is supported by the policy underlying section 349. The Senate Report that accompanied the bill later enacted and codified in section 349 states, "The basic purpose of [section 349(b)] is to undo the bankruptcy case, as far as practicable, and to restore *all property rights* to the position in which they were found at the commencement of the case." S.Rep. No. 989, 95th Cong., 2d Sess. 49 (1978) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835. The accompanying House Report has similar language. *See* H.R.Rep. No. 595, 95th Cong.2d Sess. 338 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6294; *see also* 1 *Collier Bankruptcy Manual* ¶ 349.02 to .03, at 349–6 to –9 (1991) [hereinafter *Collier*].

First Security cites a number of decisions in which ipso facto clauses have been enforced against the debtor. However, none of those cases involved bankruptcy proceedings dismissed under section 349, which specifically provides for the automatic revesting of the property of the estate in those entities in which it was vested prior to the bankruptcy. For example, in *In re Bell,* 700 F.2d 1053, 1057–58 (6th Cir.1983), the court held that an ipso facto clause became effective after the trustee abandoned the property subject to the security interest under section 554 of the Bankrupt-

cy Code. Section 554 allows the trustee to abandon property if it is "burdensome to the estate" or is of "inconsequential value and benefit to the estate." 11 U.S.C. § 554(a)–(b). There is no provision in this section that returns abandoned property to its prepetition position. *See In re Whitaker*, 85 B.R. 788, 792–94 (Bankr.E.D.Tenn. 1988); *In re Whatley*, 16 B.R. 394, 398 (Bankr.N.D.Ohio 1982). In *In re Mitchell*, 85 B.R. 564, 566 (Bankr.D.Nev.1988), the court lifted an automatic stay to allow a creditor to reach property subject to an ipso facto clause where that property had been discharged. Section 524, which governs the effect of discharges, likewise contains no provision returning discharged property to its prepetition position. 11 U.S.C. § 524; *see also In re Sparago*, 31 B.R. 552, 553–54 (Bankr.E.D.N.Y.1983). And in *In re Schweitzer*, 19 B.R. 860, 867–68 (Bankr.E.D.N.Y.1982), the court held that an ipso facto clause could be enforced against property that was exempted from the bankruptcy estate under section 522 of the Bankruptcy Code. Section 522 contains no provision returning exempted property to its prepetition position. 11 U.S.C. § 522. First Security does not cite to, and we have not found, any cases enforcing ipso facto clauses after a section 349 dismissal.

█ In sum, because the contract rights of the elder Creeches have returned to their prepetition positions, we hold that any default occurring when the elder Creeches filed for bankruptcy or failed to make payments between filing and confirmation has no effect on the elder Creeches' rights under the original loan agreements and cannot be the basis for an assertion of default by First Security. We therefore affirm the trial court's ruling regarding the claim against the elder Creeches.

█ We acknowledge that our decision effectively excuses the elder Creeches from their obligation to make payments during

the period after filing for bankruptcy and before confirmation of their reorganization plan.[1] However, our interpretation of section 349(b)(3) does not give a debtor an automatic cost-free grace period by filing for bankruptcy and later obtaining its dismissal. During the bankruptcy, a secured creditor faced with a debtor's default may seek to lift the automatic stay and foreclose on the collateral. *See, e.g., In re Edwards*, 962 F.2d 641, 645 (7th Cir.1992).

█ Moreover, in dismissing a bankruptcy, the bankruptcy court has broad discretion under section 349(b) to tailor orders to protect the rights of parties who have acted in reliance on the bankruptcy case. *See, e.g., In re Newton*, 64 B.R. 790, 793 (Bankr.C.D.Ill.1986); *cf.* 11 U.S.C. § 105(a) (granting bankruptcy court general equitable power). Congress explicitly recognized, "Where there is a question over the scope of [section 349(b)], the court will make the appropriate orders to protect rights acquired in reliance on the bankruptcy case." S.Rep. No. 989, 95th Cong., 2d Sess. 49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835; *accord* H.Rep. No. 595, 95th Cong., 2d Sess. 338 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6294 (repeated verbatim). As Collier notes, "[I]f the facts and circumstances involved in a particular case call for a different treatment than is achieved by application of any of the provisions of section 349(b), the [bankruptcy] court is authorized to negate the effectiveness of the statutory provision [or] ... to take other action to insure that equitable results are achieved...." *Collier*, ¶ 349.-03, at 349–8. First Security was given notice of the dismissal and had the opportunity to request an order protecting its rights. For example, if the bank was uncertain as to whether the stipulation would survive the dismissal, it could have requested that the bankruptcy court issue an order clarifying the effect of the dismissal provision.[2]

---

1. Our opinion is not to be construed as forgiving any of the principal or interest the elder Creeches owe to First Security.

2. In its order dismissing the elder Creeches' bankruptcy, the bankruptcy court discussed the

fact that no creditors responded when Agristor, a creditor unrelated to the instant case, moved to dismiss the elder Creeches' bankruptcy. The court stated: "[T]he creditors in the present case had ample notice of Agristor's motions to dismiss [the bankruptcy], yet not one creditor filed

Even absent such an order, if the bankruptcy court determines that a petition was not filed in "good faith," the court may dismiss the bankruptcy case with prejudice, which can preclude the debtor from repetitioning for bankruptcy and taking advantage of another automatic stay. *See In re Penz,* 121 B.R. 602, 604 (Bankr.E.D.Okla.1990). The concept of "good faith" is "intended to prevent abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting those creditors in any way...." 9 Am.Jur.2d *Bankruptcy* § 615 (1991) (citing *In re Little Creek Dev. Co.,* 779 F.2d 1068, 1072 (5th Cir.1986)). Also, sanctions may be imposed under Bankruptcy Rule 9011 against the debtor and the debtor's counsel. *Id.* (citing *In re Endrex Invest., Inc.,* 84 B.R. 207, 211 (Bankr.D.Colo.1988), *rev'd on other grounds,* 111 B.R. 939 (D.Colo.1990)); *see In re Penz,* 121 B.R. at 605.

The remaining question before us is the effect of section 349(b)(3) on the contractual relationship between the younger Creeches and First Security. The trial court exonerated the younger Creeches as guarantors on their parents' obligations. First Security, however, claims that the younger Creeches are in default under two of the loan agreements, a commercial note and a promissory note, for failing to make payments during the pendency of their parents' bankruptcy case. Larry and Joann Creech are the guarantors on the commercial note, and Walter Creech is the guarantor on the promissory note.

Section 349(b)(3) affects only the "property of the estate." Because the younger Creeches did not join the bankruptcy petition, whatever rights they had under the loan agreements did not become property of the estate when the elder Creeches filed for bankruptcy. Moreover, the younger Creeches' rights as guarantors are not so inextricably tied to the elder Creeches' rights that the former must come within the ambit of section 349(b)(3) to protect the integrity of the latter. Under such circumstances, there is no reason why the bank could not have proceeded against Larry and Joann Creech on the commercial note and Walter Creech on the promissory note without regard to their parents' bankruptcy.[3] *Cf. Surety Life Ins. Co. v. Rupp,* 833 P.2d 366, 369 (Utah Ct. App.1992).

The younger Creeches make several other arguments in support of the trial court's ruling relieving them of any liability under the commercial note.[4] First, they argue that under section 1201 of the Bankruptcy Code, they had no obligation to ensure that the monthly payments were being made after the elder Creeches filed for bankruptcy. Section 1201 places an automatic stay on any action to collect a "consumer debt"

---

an objection to the motions. If dismissal of the debtors' case was not in the best interests of the creditors, they would have filed objections to Agristor's motions." *In re Creech,* No. 86C–05249, unpubl. slip op. at 8 (Bankr.D.Utah Nov. 13, 1989). First Security did not file an objection apparently because it felt it could protect its interests by prosecuting the foreclosure action under the stipulation in state court. By abandoning any reliance on the stipulation before our court, however, First Security should have realized that section 349 would have an effect on its rights under the original loan agreements that may have accrued during the bankruptcy and that any relief from the operation of section 349 must be obtained from the bankruptcy court.

**3.** In addition, we note that the younger Creeches, like First Security, also had the opportunity to request an order from the bankruptcy court protecting any change in position that they

made in reliance on the bankruptcy proceedings. *See* 11 U.S.C. § 349(a); *see also id.* § 105(a). They were parties to the bankruptcy action as creditors and co-debtors and were notified of all proceedings throughout the case.

**4.** The younger Creeches also assert that First Security waived its claim that they were in default for the reduced payments made by the elder Creeches after the elder Creeches and the bank entered into the stipulation. The younger Creeches contend that First Security waived this claim by failing to raise it in the bank's complaint or motion for partial summary judgment. First Security's opening brief did assert that the younger Creeches were in default for their post-stipulation failure to make full payments; however, the bank explicitly stated that it was not relying on this ground for default in its reply brief and at oral argument. Thus, we have no reason to reach the younger Creeches' waiver claim.

of the bankruptcy debtor from any individual who is liable on that debt with the debtor, except in certain situations not relevant here. 11 U.S.C. § 1201(a). However, the younger Creeches have not advanced, nor have we found, any support for the contention that their parents' debt under the loan agreements is a "consumer debt." *See, e.g., In re SFW, Inc.,* 83 B.R. 27, 31–32 (Bankr.S.D.Cal.1988); *In re Circle Five, Inc.,* 75 B.R. 686, 688 (Bankr.D.Idaho 1987).

The younger Creeches also argue that the stipulation between their parents and the bank materially modified the terms of the commercial debts they had accepted as guarantors and that this modification constitutes a discharge of their obligations to perform. *See Carrier Brokers, Inc. v. Spanish Trail,* 751 P.2d 258, 261 (Utah Ct.App.1988). We decline to address this contention. Because the trial court ruled that the stipulation was unenforceable and none of the parties appealed that ruling, the younger Creeches may not raise the issue here.

 Finally, the younger Creeches argue that First Security should be estopped from claiming a default because the bank agreed to accept reduced payments. However, on appeal, First Security claims only that filing for bankruptcy and failure to make payments *prior* to the stipulation constitute the events of default; First Security does not rely on any conduct or omission occurring *after* the stipulation.[5] To establish estoppel, the proponent must show, inter alia, that he or she acted or refrained from acting in reliance on the opposing party's behavior. *CECO v. Concrete Specialists, Inc.,* 772 P.2d 967, 969–70 (Utah 1989). The younger Creeches have not averred specifically how First Security's conduct in entering the stipulation induced them into failing to make payments *prior* to the stipulation. Consequently, we reject the younger Creeches' estoppel argument.

 As a final matter, we address First Security's argument that the trial court

improperly reserved ruling on the issue of attorney fees and costs. We hold that First Security is precluded from raising this issue because it is the party that petitioned for interlocutory appeal, thereby preventing the trial court from resolving the issue. First Security should have obtained a final judgment on this issue before raising it on appeal. In addition, because we have reversed the trial court's finding of default in regard to the younger Creeches, the facts pertinent to that claim likely have changed.

In sum, we affirm the trial court's order finding that Orville and Ruby Creech were not in default under the loan agreements. We reverse the trial court's finding that Larry and Joann Creech were not in default on the commercial note and that Walter Creech was not in default on the promissory note. The matter is remanded.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice (dissenting in part):

I concur with the majority that the elder Creeches' failure to make loan payments to First Security Bank (FSB) for eight months after filing bankruptcy constitutes a default for which the younger Creeches, as guarantors, are liable. I cannot agree, however, that no default has occurred vis-à-vis the elder Creeches because of that same failure. This anomalous result is attributed to the effect of section 349 of the Bankruptcy Code.

The problem with the majority holding as to the elder Creeches is that it misconstrues the impact of the automatic stay. 11 U.S.C. § 362. The facts of this case are somewhat unusual for a bankruptcy case in that the elder Creeches did not file for bankruptcy protection, as frequently occurs, to avoid imminent foreclosure against the farm due to default in payments under the loan. The Creeches were current in their payments when they filed bankruptcy. It was not until after filing that they became in arrears in their loan payments.

---

5. *See supra* note 4.

The automatic stay is, as one commentator has noted, a "dramatic restraint" that occurs when a debtor files bankruptcy. Richard I. Aaron, *Scope of the Automatic Stay—Section 362(a), in Bankruptcy Law Fundamentals* § 5.01[1], at 5–3 (1992). However, the automatic stay "is not permanent relief. It continues in effect while the property remains a part of the estate unless there is a successful effort to have the stay lifted, *unless the case is dismissed* or until the debtor receives or is denied a discharge." *Id.* at 5–1 (emphasis added).

It is as to the temporary nature of the automatic stay that the majority's analysis breaks down. The majority would have the automatic stay forgive the Creeches' failure to make payments falling due while the stay was in effect. Were that the law, a motion for a lift of stay might be an exercise in futility. If a debtor in bankruptcy fails to make payments on a secured loan after filing bankruptcy, a creditor may move the bankruptcy court for a lift of the automatic stay so that it can proceed to foreclose against the property securing the loan. But under the majority's analysis, the debtor would not be in default because he has filed bankruptcy. Therefore, there would be no reason to lift the stay.

FSB moved for dismissal of the Creech bankruptcy after the Creeches defaulted post-petition. The motion was denied. However, a stipulation between the Creeches and FSB was subsequently entered into to permit the Creeches one last chance to perform. As part of the stipulation, FSB demanded that any default of the Creeches would entitle it to begin foreclosure proceedings in a state court without having to petition for the permission of the bankruptcy court. The bankruptcy court included the terms of the stipulation in the confirmation order.

When FSB claimed that the Creeches had defaulted under the stipulation, it began foreclosure proceedings in May of 1988 in the state court below, although the chapter 12 bankruptcy continued. It is undisputed that FSB was entitled to this remedy in the event of default under the terms of the confirmation order and bankruptcy law.

The majority's position that the subsequent dismissal of the bankruptcy halted the foreclosure proceeding already begun has no basis in bankruptcy law. Nor does the majority cite any cases in support of that interpretation of the effect of the dismissal.

It is true that the trial court held that the stipulation and confirmation order were void, but that does not aid the Creeches. The parties agree that with the stipulation and bankruptcy order out of the picture, their rights are to be determined under the 1986 loan agreements. There is no question but that the Creeches are in default under those agreements, having missed eight monthly payments that fell due after they filed bankruptcy. The Creeches seek to excuse those nonpayments because they assert that under the Bankruptcy Code, they could not make payments because such payments would have constituted "a post petition transfer of assets and use of such collateral without court authorization." The Creeches' statement evidences a misunderstanding of the Bankruptcy Code, and in any case, the majority does not rely on that assertion. Instead, the majority employs section 349 to excuse the failure to make the eight payments and to move those missed payments apparently to the end of the loan. Neither the Creeches nor FSB gives any such effect to section 349.

Section 349 is a narrow provision interpreted by the courts to apply only to unwind those unique bankruptcy protections specifically referred to: "[T]he courts have refused to extend the reinstatement effect of Section 349(b) beyond its expressly enumerated provisions." 2 Lawrence P. King et al., *Collier on Bankruptcy* § 349–11 (15th ed. 1993); *see Norton v. Hoxie State Bank*, 61 B.R. 258, 260 (Bankr.D.Kan.1989) ("Section 349(b)(2) affects only the specific actions delineated in that subsection."). In his oral arguments in this case, the Creeches' attorney conceded that in response to questions posed by Justice Zimmerman:

JUSTICE ZIMMERMAN: [Section] 349 says when you dismiss [a case] you unwrap the bankruptcy. My question

is aren't there any cases about that effect?

THE CREECHES' ATTORNEY: There isn't much law with respect to section 349. Primarily when you see a case concerning 349, it's a concern about some property that was transferred during bankruptcy or a lien that was avoided through the bankruptcy process and where that property should go afterwards. It deals primarily with property rights, but it also says that the bankruptcy should be undone.... I don't think you can take a literal interpretation of section 349 that would require that you ignore everything that happened in connection with the bankruptcy.... Section 349 does not instruct the court to ignore that the bankruptcy happened.

As was stated in oral arguments, section 349 generally refers to revesting property of the estate which was brought into the estate by one of the exotic and artificial bankruptcy provisions, such as section 547, "preferential transfers," in the parties which held it prior to the bankruptcy. For example, it is not unknown for a debtor prior to filing bankruptcy to divest himself or herself of property so that it would be out of the reach of creditors, i.e., so that it would not become "property of the estate" upon filing bankruptcy. See In re Kaiser, 32 B.R. 701 (Bankr.D.C. 1983) (court held that property transferred to wife of debtor on eve of bankruptcy was nevertheless property of the estate). Another example of a preferential transfer is the preference of one creditor over the others by paying one debt in full before filing bankruptcy. Bankruptcy provides a remedy for this kind of bad faith behavior by empowering the trustee to recoup the property into the property of the estate. The rationale behind the Code's granting such powers to a trustee is that whether property which could potentially be property of the estate is used to pay a single creditor or simply hidden from the reach of creditors, such action results in a diminution of the property of the estate and thus an inequitable distribution to creditors during bankruptcy. Upon dismissal of a bankruptcy, which is essentially a failure of the bankruptcy, the trustee's actions are "unwound." The property goes back to whomever the debtor transferred it to prior to bankruptcy, and the debtor is no longer protected against creditors pursuing their contractual remedies.

The majority cites no cases to support the use of section 349 in the manner it proposes. In re Nash, 765 F.2d 1410, 1413 (9th Cir.1985), the only case cited by the majority purportedly supporting its holding, is a chapter 13 case that deals with the issue of the disposition of funds held by a trustee upon dismissal of a bankruptcy. Neither party in this case argued on appeal that section 349 controls; in fact, both attorneys attempted to make clear in oral arguments that section 349 was not controlling:

JUSTICE ZIMMERMAN: It seems to me that 349 kinda governs here, doesn't it? Is that not the case?

FSB'S ATTORNEY: I don't think 349 governs.

Justice Zimmerman posed a similar question to the attorney for the Creeches:

JUSTICE ZIMMERMAN: 349 says you unravel it.

THE CREECHES' ATTORNEY: 349 deals with respect to property rights. It doesn't require again that you ignore what happened.... We submit that section 349 answered the question with respect to which agreements were enforceable.... [The issue of whether the original documents or the stipulation governs is not before us.] Section 349 really is not controlling law on the issues before the court today....

JUSTICE ZIMMERMAN: [Under section 349, the debtor's property is] just like it was the day before bankruptcy....

THE CREECHES' ATTORNEY: But [the trial court] also recognized reality. We're not travelling in time here, going back to some date. Things happened.

I would reverse the trial court decision as to both the elder and younger Creeches

and remand this case for further proceedings consistent with this opinion.

STEWART, J., concurs in the dissenting opinion of Associate Chief Justice HOWE.