**MILFORD POWER COMPANY, LLC, Plaintiff,**

**and**

**Milford Holdings, LLC, Intervenor,**

**v.**

**PDC MILFORD POWER, LLC, Defendant.**

C.A. No. 506–N.

Superior Court of Delaware, New Castle County.

Submitted: Nov. 16, 2004.

Decided: Dec. 17, 2004.

Thomas R. Hunt, Jr., Esquire, and David J. Teklits, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorneys for Plaintiff Milford Power Co., LLC.

Richard I.G. Jones, Jr., Esquire, and Richard L. Renck, Esquire, Ashby & Geddes, Wilmington, Delaware, Attorney for Intervenor.

Richard G. Placey, Esquire, and Richard M. Donaldson, Esquire, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware; Gary C. Crossen, Esquire, and Rebecca L. Tepper, Esquire, Rubin and Rudman, LLP, Boston, Massachusetts, Attorneys for PDC Milford Power, LLC.

## OPINION

STRINE, Vice Chancellor.

The plaintiffs in this case, Milford Power Company, LLC and the owner of a 95% interest in Milford Power, Milford Holdings LLC, bring this case seeking a declaration that defendant PDC Milford Power, LLC ("PDC") has lost all membership interest in Milford Power as a result of its filing of a petition for bankruptcy on February 27, 2004. Although PDC's bankruptcy petition was dismissed, the plaintiffs nonetheless allege that the plain terms of the Milford Power LLC Agreement automatically divested PDC of its membership interest in Milford Power upon PDC's filing of its bankruptcy petition and assigned its membership interest and all attendant rights to Milford Holdings, as the sole remaining member of Milford Power. Furthermore, the plaintiffs allege that the plain terms of the LLC

Agreement dictate that this assignment occurred without any obligation on the part of Milford Power, as assignee, to pay PDC any compensation for its prior interest.

For its part, PDC contends that the doctrine of unclean hands prevents the plaintiffs from relying on the ipso facto clause in the LLC Agreement because PDC sought refuge in bankruptcy when plaintiffs' affiliates improperly sought to foreclose on PDC's membership interest. In addition, PDC argues that the ipso facto clause in the LLC Agreement is preempted by certain provisions of the Federal Bankruptcy Code.

In this opinion, I conclude that PDC's unclean hands defense does not bar the plaintiffs from relying upon the ipso facto clause in the LLC Agreement. But, I also conclude that the ipso facto clause is preempted to the extent that it would deprive PDC of the economic rights available to an assignee of an LLC membership interest under § 18–702(b)(2) of the Delaware LLC Act. By contrast, the ipso facto clause is enforceable insofar as it divests PDC of its right to participate as a member in the governance of Milford Power. This conclusion rests largely on my adoption of the reasoning of the United States District Court for the District of Delaware in *In re IT Group, Inc.*[1]

## I. *Factual Background*

Milford Power is an LLC that was established to own and operate a natural gas-fired electric generation facility with 540 megawatt capacity (a.k.a., a "power plant") in Milford, Connecticut. When created, Milford Power's ownership was split up between what can be regarded as two different parties in interest. Through two separate affiliates, a large public company, El Paso Corporation, held 95% of Milford Power's membership interests and was the party that put up substantial cash to help fund the construction of the power plant. For the sake of simplicity, I herein refer to these affiliates solely as El Paso.

The other member of Milford Power was PDC. PDC is a single-purpose entity that was formed by a Texas-based development firm, Power Development Company, LLC. PDC alleges that it played an important role in developing the idea of building the power plant in Milford, Connecticut and helping Milford Power obtain the necessary approvals. In connection with this role, PDC received a 5% membership interest in Milford Power.

The LLC Agreement vests the power to manage Milford Power in the members. The Agreement creates several committees to manage the firm and each member, including PDC, is given the right to appoint representatives.[2]

Unanimous consent of the members is required in order for Milford Power to engage in certain activities, including mergers, repurchases of member units, or bankruptcy filings.[3] As to certain other important decisions, a super-majority vote of the members of relevant committees is required.[4] It is unclear from the text of the LLC Agreement whether El Paso had sufficient voting power on any committee to meet this threshold without support from the PDC member. For still other decisions, a mere majority vote of the members is required.[5] On a day-to-day basis, the LLC Agreement contemplates

---

1. 302 B.R. 483 (D.Del.2003).

2. LLC Agreement Art. 5.3.

3. LLC Agreement Art. 5.2(a).

4. LLC Agreement Art. 5.2(b).

5. LLC Agreement Art. 5.2(c).

the appointment of officers to conduct the company's operations and by its own terms, created a position of General Manager.

From the get-go, Milford Power was substantially leveraged. Although El Paso contributed over $78 million to fund a bridge loan, Milford Power obtained an additional loan (which eventually became non-recourse) for over $271 million from a syndicate of lenders (the "Lenders"). Although this debt was not an obligation of PDC itself, PDC's membership interest in Milford Power was pledged as collateral to secure the loan, as were the member interests controlled by El Paso.

As far as can be ascertained from the record, this debt matured and was due and owing as of October 1, 2002. But Milford Power defaulted.

The Lenders agreed to a forbearance to give Milford Power more time. When that time ran out, Milford Power remained in default.

What happened precisely at this stage is unable to be determined on this record with accuracy. The parties have burdened me only with excerpts from pleadings filed in an action in a New York court that is related to this case. I have therefore attempted to distill from these documents the essence of what occurred and of what is indisputable.

According to PDC, the Lenders made certain promises during 2003 to work with Milford Power to restructure the defaulted debt. But then, says PDC, the Lenders changed direction and permitted El Paso to exit the Milford Power scene in exchange for El Paso's member interests in Milford Power and certain additional, unspecified consideration. El Paso transferred its member interests to a new entity ultimately controlled by the Lenders. The

Lenders sought approval from the Federal Energy Regulatory Commission for the transfer of El Paso's interest in Milford Power to their new vehicle, Milford Holdings. PDC did not object to that request.

In their application, the Lenders indicated that their intention was not to become long-term operators of the power plant but instead to find a third-party buyer. According to PDC, the Lenders led it to assume that PDC would be able to retain its membership interest in Milford Power and receive a 5% share of any later sale of the entity.

But instead of doing so, the Lenders—or so PDC contends—took an entirely different tack. Initially, Milford Holdings purported to bind Milford Power to a management contract under which the firm's operations would be managed by an entity named CPV Milford, LLC, which is the managing member of Milford Holdings. Allegedly, this decision was made without any input from PDC, as have other allegedly important business decisions. But the FERC application, to which PDC supposedly consented, describes at length the substantial authority that would be vested in CPV Milford, a description that was designed to persuade the FERC that Milford Holdings (and its investors, the Lenders to Milford Power) would not be deemed a public utility, in part because CPV Milford would have "complete discretionary managerial authority over the Project Company and be responsible for the management of all activities of the Plant." [6]

Then, the Lenders began to take steps to foreclose on PDC's membership interest by scheduling a foreclosure sale. As of that time period, Milford Power owed the Lenders in the vicinity of $250 million.

6. Pl.'s Reply Br. Ex. B. at 19.

What PDC did in response to the foreclosure is what gives rise to this case. Rather than sue the Lenders in an appropriate state court to enjoin the foreclosure sale, PDC filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts on February 27, 2004. In its filing, PDC indicated its intention to file an adversary proceeding against the Lenders alleging, among other things, that they were improperly acting to deprive PDC of its membership interest in Milford Power.

The Lenders moved to dismiss PDC's filing on grounds that cannot be discerned from the record before me. On April 27, 2004, the Bankruptcy Court granted the motion to dismiss in a handwritten order that is devoid of explication. On June 2, 2004, the Bankruptcy case was officially closed.

A few weeks later, two lawsuits were filed. In the Supreme Court of the State of New York, the Lenders filed an action seeking to foreclose on PDC's interest in Milford Power. The Lenders alleged that Milford Power owed over $250 million to them as of June 2004 and that the money the Lenders would raise in a sale of PDC's interest should be used to reduce that amount. El Paso was also named as a party because it allegedly held a subordinate security interest in PDC's 5% interest.[7]

That same day, Milford Power brought this action for declaratory judgment. In this action, later joined by Milford Holdings as an intervening plaintiff, Milford Power sought a declaration that PDC had automatically assigned its membership interest in Milford Power to Milford Holdings when it filed for bankruptcy. In the complaint, the plaintiffs relied on Article 11.2 of the LLC Agreement—the "Ipso Facto Clause"—which reads in pertinent part as follows:

> *Automatic Withdrawal of Member—A Member shall be deemed to have withdrawn from the Company and shall be treated as a Withdrawn Member under this Agreement automatically upon the occurrence of any of the following events:*
>
> *(a) Immediately if any Member shall (i) voluntarily file with a Bankruptcy Court a petition seeking an order for relief under the Federal bankruptcy laws,* (ii) seek, consent to or fail to contest the appointment of a receiver, custodian or trustee for itself or for all or any significant part of its property, (iii) file a petition seeking relief under the bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction, (iv) make a general assignment for the benefit of its creditors, or (v) admit in writing its inability to pay its debts as they mature;[8]

The LLC Agreement defines the term "Withdrawn Member" in Article 11.9, which reads as follows:

> (a) *Right to Withdraw*—Subject to the provisions of Article XI, a Member (in this Agreement called a "Withdrawing Member") shall have the right to withdraw from the Company at any time after the commencement of commercial operations of the Plant by ten days written notice to the other Members (in this Agreement called a "Withdrawal Notice"). *The Withdrawing Member shall assign all its rights and interests in the Company to the remaining Members or their designees and the Withdrawing*

---

7. In its bankruptcy filing, PDC listed El Paso as an unsecured creditor having a disputed claim of over $3 million against PDC.

8. LLC Agreement Art. 11.2 (emphasis added).

*Member waives any and all rights that it might otherwise have had pursuant to the Act arising from its withdrawal from the Company. The Withdrawing Member hereby irrevocably appoints the Company its attorney-in-fact,* with full authority in its place and stead and its name or otherwise, *to take any action and to execute any instrument which the Company may deem necessary or advisable to accomplish such assignment of the Withdrawing Member's rights and interests in the Company to the remaining Members or their designees.* Upon thirty days' prior written notice, the Company may terminate any contracts or agreements with the Withdrawing Member or any of its Affiliates, pursuant to which the Withdrawing Member or its Affiliates provide materials or services to the Company, and the Company shall have no further liability to the Withdrawing Member or its Affiliates under such contracts or agreements, other than the payment of any obligations incurred prior to the date of such termination.

(b) *Reimbursement Rights*—In the event of such withdrawal, the Company shall retain all contributions theretofore made by the Withdrawing Member, and such Withdrawing Member shall pay its share of such further obligations and commitments that are due and payable at the time of the giving of the Withdrawal Notice including any obligations attributable to the work performed or actions taken by the Members or any Committee of the Company prior to the date of withdrawal including termination costs.

(c) *Indemnification of Withdrawing Member*—The remaining Members shall indemnify and hold harmless the Withdrawing Member:

(i) For all amounts due and payable in connection with the Company and its business after the date of withdrawal that were not incurred prior to the date of withdrawal; and

(ii) For all amounts or damages arising out of activities of the non-withdrawing Members or the Company undertaken after the date of withdrawal.[9]

Through this action, the plaintiffs seek a declaration that PDC is a "Withdrawn Member" and that Milford Power is its attorney-in-fact for the purpose of transferring PDC's interest to Milford Holdings. During the course of the case, it has become clear that the plaintiffs do not believe that any consideration is owed to PDC for this transfer.

PDC reacted to the New York and Delaware suits in a related manner. In the New York action, PDC alleged that the Lenders, in concert with Milford Holdings, had breached certain duties they allegedly owed to PDC, and therefore that the Lenders should be precluded from foreclosing on PDC's member interest in Milford Power and were liable to PDC for damages.

Meanwhile, in this action, PDC takes the position that its bankruptcy filing was caused by improper conduct by the Lenders (a non-party to this action) and by Milford Holdings (an entity affiliated with the Lenders that is a party to this action). Candidly, it is difficult to discern exactly what misconduct the Lenders or Milford Holdings engaged in that could, in the end, be found to constitute a cognizable breach of legal or equitable duties owed to PDC.

As pled and as recounted in an affidavit filed by PDC's manager in this court, PDC contends that the Lenders and Milford Holdings have engaged in "a pattern of

---

9. LLC Agreement Art. 11.9 (emphasis added).

conduct demonstrating a concerted and improper predatory plan to divest and take PDC's 5% interest prior to any sale of Milford Power in order to reap 100% of the proceeds from" the sale of the power plant for themselves.[10] The theory of their approach seems to be that the Lenders think that 1) the power plant is worth substantially more than the over $250 million owed by Milford Power, 2) that El Paso's relinquishment of its equity, and (PDC suspects) payment of some additional cash, fully satisfied the debt owed by Milford Power, and 3) that the Lenders are trying to steal PDC's rightful 5% of the upside from a sale of the power plant.

To a judge who handles a lot of business cases, the picture that is painted seems intuitively implausible. It presupposes that El Paso, which had put up substantial cash equity and which owned a 95% interest in Milford Power, made a completely irrational decision to not only give up its interest but to pay additional cash to do so, even though the power plant had a sale value that would easily pay off the debt[11] and produce a huge upside. In fact, in its papers, PDC argues that its 5% interest was worth $9 million. When I asked for clarification, I was told that this was the value assuming a full pay off of the over $250 million owed to the Lenders. If that is true, PDC is alleging that Milford Power has an enterprise value of $430 million and therefore that El Paso had, in fact, fallen off the proverbial turnip truck before it decided to exit its investment in Milford Power.

In a confusing post-argument submission, PDC attempts to prove that the power plant will generate over $82 million in guaranteed payments a year from a Cost of Service Agreement between the power plant project and ISO New England, Inc. for the duration of the plant's service life. It is not at all clear what this means; in particular, whether this sum was a total or the amount that would be received by Milford Power in excess of the costs of operating the plant. In any event, PDC does not dispute that the Lenders are currently due over $250 million.

## II. The Plaintiffs' Motion For Summary Judgment

The plaintiffs' motion for summary judgment is presented in a straightforward manner. They argue that the plain language of the Milford Power LLC Agreement operated to automatically turn PDC into a "withdrawn member"[12] and to transfer its member interest to Milford Holdings as of the time PDC filed for bankruptcy. The provision of the LLC Agreement that so provides is, they argue, fully consistent with Delaware law, because an express provision of the Delaware Limited Liability Company Act provides:

> A person ceases to be a member of a limited liability company upon the happening of any of the following events: (1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member:
>
> * * *
>
> (b) Files a voluntary petition in bankruptcy.[13]

Furthermore, the plaintiffs argue that the terms of the LLC Agreement make it clear that as a "withdrawn member" PDC had no further claim on Milford Power and

---

**10.** Corbett Aff. ¶ 5.

**11.** Or, alternatively, that would have permitted Milford Power to refinance the debt and continue to own the power plant.

**12.** LLC Agreement Art. 11.2(a).

**13.** 6 *Del. C.* § 18–304.

that its membership interest was assigned free of charge to Milford Holdings. As the LLC Agreement makes clear, the term "withdrawn member" is defined identically to the term "withdrawing member" in Article 11.9.[14] That section provides that a withdrawing member "shall assign all of its rights and interests in the Company to the remaining Members or their designees and the Withdrawing Member waives any and all rights it might have otherwise have had pursuant to the Act arising from its withdrawal from the Company."[15] Notably, within thirty days of the withdrawal, Milford Power may terminate any contracts for the provision of goods and services between itself and the withdrawn member and shall have no further liability under those contracts, "other than the payment of any obligations incurred prior to the date of such termination."[16] Although the withdrawn member is entitled to indemnification from Milford Power as to any acts of the LLC or its members after the withdrawal, that is the only apparent duty owed to the withdrawn member. The withdrawn member retains, however, the obligation to pay all capital contributions or other debts owed to Milford Power as of the date of the withdrawal and Milford Power is entitled to "retain all contributions theretofore made by the Withdrawing Member...."[17]

For all these reasons, the plaintiffs say that it is indisputably clear that as of the date PDC filed for bankruptcy, it automatically became a withdrawn member and its membership interest was to be assigned to Milford Holdings free of charge.

### III. *PDC's Arguments Against Summary Judgment*

Unsurprisingly, PDC does not believe that matters are quite so clear-cut. It contends that summary judgment should be denied to the plaintiffs for three primary reasons.

First, PDC argues that the equitable doctrine of unclean hands precludes the plaintiffs from obtaining the relief they seek; that is, PDC seeks to advance an affirmative defense as a barrier to summary judgment. For the reasons previously noted, PDC argues that Milford Holdings and the Lenders have engaged in a course of inequitable conduct designed to deprive PDC of its 5% stake in Milford Power. Because of their oppressive conduct, PDC contends that it had little or no option but to seek protection from the Bankruptcy Court. Thus, because PDC's filing was allegedly caused by the improper conduct of Milford Holdings (or at least by its controlling affiliates, the Lenders), PDC argues that Milford Holdings cannot exploit the bankruptcy filing and use that as a basis to divest PDC of its membership interest.

Second, PDC contends that the Ipso Facto Clause of the LLC Agreement that purports to have made PDC a withdrawn member when it filed for bankruptcy is preempted by federal law. To wit, PDC says that the LLC Agreement is an executory contract and that certain provisions of the Bankruptcy Code preclude the effectiveness of a contract provision divesting a debtor of a property interest in an executory contract simply because the debtor filed for bankruptcy.

Finally, PDC argues that even if the Ipso Facto Clause of the LLC Agreement purporting to make it a withdrawn member is not preempted, that provision does

---

**14.** LLC Agreement Ex. A, at 45.

**15.** LLC Agreement Art. 11.9(a).

**16.** *Id.*

**17.** *Id.* Art. 11.9(b).

not unambiguously provide for a transfer of PDC's member interest free of charge to Milford Holdings. According to PDC, such an interpretation of the LLC Agreement would render the bankruptcy provision a penalty provision, which is at best disfavored by our law.

I address the first of these two arguments in turn. As will be seen, my resolution of the second issue renders it unnecessary for me to address PDC's third argument.

## IV. *PDC's Unclean Hands Argument Lacks Merit*

PDC's initial argument is that it was somehow forced into a bankruptcy filing by the Lenders and Milford Holdings and that the affirmative defense of unclean hands bars the plaintiff's request for summary judgment. Because its decision to enter bankruptcy was caused by allegedly improper acts of these parties, PDC contends that Milford Holdings cannot rely upon the Ipso Facto Clause.

The problem with PDC's argument is that it is unsupported by any factual contention that makes sense. Contrary to the plaintiffs, I believe it possible to conceive of circumstances in which the improper conduct of a party to an LLC Agreement towards a fellow member could in fact render that member insolvent and cause a valid bankruptcy filing. In that circumstance, the party that acted improperly could be deemed to have forced the bankruptcy filing and therefore be estopped

from relying upon that event as a basis to deprive the innocent member of its ownership interest in the LLC. Whether considered unclean hands,[18] as PDC would have it, or as a contractual defense precluding Milford Holdings from relying upon the occurrence of a condition its own behavior brought about,[19] in the correct circumstances, PDC's argument might be indulged.

This is not an intellectual exercise, however. PDC bears the burden of producing evidence that rationally creates a triable issue of fact regarding the sustainability of its affirmative defense.[20] But it has failed to do so, advancing no facts that plausibly support a finding of unclean hands on the part of the plaintiffs. Despite its protestations to the contrary, PDC is well-positioned and duty-bound to support its argument by a non-cursory affidavit. PDC presumably knows exactly what has been done to it.

In none of its submissions has PDC presented any basis to infer that the Lenders did not have every right in law and in equity to collect the massive debt owed to them by Milford Power. Collecting on a lawful debt that is in default is not unfairly predatory; it is a necessary and typical course of action for a lender whose borrower has failed to pay a debt that is due.

In this respect, it is important to note that none of the supposed misconduct to which PDC points is causally related to its

---

18. *Nakahara v. NS, 1991 American Trust*, 718 A.2d 518, 522 (Del.Ch.1998) (reviewing the history and application of the doctrine of unclean hands).

19. *See Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *6 n. 32 (Del.Ch. Mar 22, 2004) (suggesting that an equitable defense presented as an application of the clean hands doctrine could perhaps be better conceptualized

as a contractual defense based on breaches of the implied covenant of good faith and fair dealing).

20. *See, e.g., Niehenke v. Right O Way Transp., Inc.*, 1996 WL 74724, at *2 (Del.Ch. Feb 13, 1996) ("Defendants bear the burden of pleading and proving "unclean hands" as an affirmative defense.")

bankruptcy filing.[21] For example, PDC argues that it was somehow led to believe that the Lenders and Milford Holdings would allow it to continue to hold its 5% interest in Milford Power after El Paso's interest was transferred to Milford Holdings and would receive 5% of the proceeds from any sale of the power plant. That argument is unsupported by any non-conclusory affidavit describing exactly when and how the Lenders and Milford Holdings communicated that supposed agreement to PDC, despite the fact that PDC is obviously well-positioned to make such a description. Nor does the record contain the manifestation one would expect of a representation of that magnitude, namely, a writing of some kind indicating that the Lenders or Milford Holdings was waiving any of their rights under the LLC Agreement or the lending agreements. But even more importantly, whether a representation of that kind was made or not simply could not have caused PDC to file for bankruptcy. The representation, if any, did not make PDC insolvent or even operate to divest PDC of its membership interest.

Likewise, the mere fact that the Lenders had taken steps to foreclose on PDC's membership interest does not, on this record, create a triable issue of fact precluding summary judgment for the plaintiffs. The Lenders had lent Milford Power over $250 million, Milford Power was in default as to approximately that same amount, and PDC's membership interest was pledged as security for that loan. Given these facts, and given the lack of any sensible articulation of a different economic reality by PDC, it is impossible to rationally infer from this record that the Lenders' decision

to foreclose could constitute unclean hands.

Most crucially, the Lenders' decision to foreclose did not cause PDC to make a bankruptcy filing. PDC had the option, which it has now taken, to seek to enjoin the foreclosure by filing a lawsuit in state court. Instead, it made the tactical decision to file a bankruptcy petition that the Bankruptcy Court found to be improvident. That PDC no doubt did so precisely to forestall the foreclosure sale does not, however, mean that the Lenders' actions rendered PDC insolvent and therefore caused the bankruptcy filing. The decision to file for bankruptcy was PDC's own tactical choice and there is no evidence that creditors other than the Lenders were beating on its door.

Likewise, PDC's assertion that Milford Holdings has been making decisions for Milford Power without including PDC in the process does not preclude summary judgment. Regardless of whether or not that has occurred and whether or not that was improper if it did occur, Milford Holdings' actions did not cause PDC to file for bankruptcy. If PDC believed that its rights as a member of Milford Power were being violated, it could, and later did, file a lawsuit. But, there is no evidence that those violations rendered PDC insolvent or caused it to file for bankruptcy.

In sum, there is no evidence in this record that would justify a rational inference that the Lenders did not have a good faith basis to attempt to foreclose on PDC's interest in Milford Power. The cursory and confusing contentions made by PDC regarding the supposedly improper conduct towards it do not cohere into any rationally explicable economic scenario involving inequitable or illegal conduct by

---

21. *See Farkas v. Jarrell,* 1993 WL 401878, at *3 (Del. Ch. Sep 17, 1993) ("Relief may be barred by the doctrine of un-clean hands, but only if the challenged conduct relates directly to the matter in controversy.").

the Lenders and Milford Holdings. At best, one infers that PDC believed that it possessed some ability to extract consideration from the Lenders as a price for supporting the transfer from El Paso to Milford Holdings and thought that it had done just that by receiving unspecified representations (from someone unspecified on some unspecified date) that PDC would continue to own 5% of Milford Power, regardless of whether the Lenders had been repaid in full. An unusual belief of this kind would seem to be precisely the kind that would normally be embodied in a writing, and none is in the record. Nonetheless, what remains most critical is that none of the supposed misbehavior by the Lenders or Milford Holdings caused PDC to make a bankruptcy filing.

■ In so concluding, I do not hesitate to surface some normative assumptions that support the result I reach. For starters, the unclean hands doctrine should always be applied with prudence and not as a wide-ranging license for judges to constrain parties that are alleged to have engaged in conduct that might be perceived as harsh or unfair, but that is nonetheless not a breach of any precise legal or equitable duty.[22] Many sophisticated parties like PDC sign contracts that have terms that might be considered onerous; our law does not relieve them of the burden of those decisions simply because of their after-the-fact regrets. To do so would greatly undermine the utility of contracts, to the detriment of wealth creation.[23]

To adopt PDC's argument would invite debtors to resort inappropriately to the Bankruptcy Courts in situations when there are other legal processes open to them to protect their rights. Rather than pursue the appropriate course of action and attempt to enjoin the procession of a foreclosure sale in the expected manner—through an action in a state court with jurisdiction—debtors will simply make Bankruptcy Court filings. Even if, as here, that Bankruptcy Court filing is later dismissed as unwarranted, the debtor has bought time because of the automatic stay provision, thus forestalling the foreclosure sale through the simple expedient of making an unjustified filing. Even better, from the debtor's perspective, is that the improvident filing comes almost cost-free because the debtor would have license to argue that the doctrine of unclean hands precludes the enforcement of contractual rights belonging to the lender or its affiliates that are triggered by a bankruptcy filing unless and until it is definitively determined that the lender and its affiliates did not violate any legal or equitable rights of the debtor, regardless of whether the debtor was actually rendered insolvent by the lender and its affiliates before the bankruptcy filing.

There is no justification for creating a perverse incentive scheme of this kind in the name of equity. If a debtor believes

---

22. *See, e.g., Gallagher v. Holcomb & Salter,* 1991 WL 158969, at *4 (Del. Ch. Aug 16, 1991) ("The equitable doctrine of unclean hands is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered. The question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit.") (citations omitted).

23. For example, if lenders cannot rely on contracts, the cost of debt would likely increase to offset the increased risk of non-collection.

that a lender is improperly foreclosing on its interests, it is, of course, free to seek to enjoin the foreclosure or to file for other relief. But if, instead, it chooses to file a bankruptcy application, the debtor is in no position to demand that a court of equity to relieve it of the consequences of that tactic when the tactic fails because the Bankruptcy Court concludes that the filing was unsustainable. That is especially so when the debtor cannot articulate any rational basis for the court to make a rational inference that the Lenders were not acting in the good faith belief that they had a right to foreclose.

For all these reasons, I conclude that the doctrine of unclean hands does not prevent the entry of summary judgment for the plaintiffs. If PDC's claims of improper conduct by the Lenders are later upheld by a New York court, PDC can be made whole by an award of monetary damages.[24] In the meanwhile, there is no rational justification in equity or law for preventing Milford Holdings from exercising its clear contractual rights.

## V. Is the Ipso Facto Provision In The LLC Agreement Preempted By Federal Law?

■ PDC's next argument requires a consideration of provisions of the Bankruptcy Code that have generated conflicting and confusing decisions from federal courts. Thousands of pages of judicial, lawyerly, and academic writings on the subject have tried to instill some predictability and coherence into the aspects of bankruptcy law relevant to this decision but no consensus has resulted,[25] leaving conflicting precedent.

The courts of this state have no power to clear these murky waters and I will not burden the reader with a recitation of the full debate relevant to the decision I must make. Instead, I will endeavor to describe the parties' contending positions and to render a sensible, if by no means inarguable, decision.

I begin by describing PDC's argument. PDC contends that its membership interest in the LLC Agreement became part of the Bankruptcy Estate when it filed for bankruptcy on February 27, 2004, irrespective of the Ipso Facto Clause. In support of that argument, PDC points initially to § 541(c)(1) of the Bankruptcy Code, which states in pertinent part that:

... an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

24. In its papers, PDC makes clear that its desire is to receive its pro rata share of the proceeds from a sale of the power plant.

25. See, e.g., Laurence D. Cherkis, Recommendations of the National Bankruptcy Review Commission: Partnership as Debtor, Partner as Debtor, 5 Am. Bankr.Inst. L.Rev. 381 (1997); Scott B. Ehrlich, The Fourth Option of Section 521(2)(A)-Reaffirmation Agreements and the Chapter 7 Debtor, 53 Mercer L.Rev. 613 (2002); Hon. Randolph J. Haines, Time to Eliminate Ipso Facto Clauses, 2002 No. 5 Norton Bankr.L. Adviser 2, (2002); Jessica L. Kotary & Nicole L. Inman, Eliminating "Ex-

ecutory" from Section 365: The National Bankruptcy Review Commission's Panacea for an Ailing Statute, 5 Am. Bankr.Inst. L.Rev. 513 (1997); Sally S. Neely, Partnerships and Partners and Limited Liability Companies and Members in Bankruptcy: Proposals for Reform, 71 Am. Bankr.L.J. 271 (1997); Larry E. Ribstein, Partner Bankruptcy and the Federalization of Partnership Law, 33 Wake Forest L.Rev. 795 (1998); Steven A. Waters & Eric Terry, Bankruptcy and Insolvency Issues for Partnerships, LLCs, and Their Owners—the Good, the Bad, and the Ugly, 39 Tex. J. Bus. L. 51 (Spring 2003).

* * *

(B) that is conditioned ... on the commencement of a case under this title ...[26]

By virtue of § 541(c)(1), PDC says that its membership interest vested in the estate when its bankruptcy case was commenced. Moreover, because of the nature of PDC's membership interest, PDC argues that another section of the Bankruptcy Code is implicated. To wit, PDC contends that the LLC Agreement is an executory contract within the meaning and reach of § 365(e)(1) of the Bankruptcy Code, which states in pertinent part that:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;[27]

In contending that the LLC Agreement is an executory contract, PDC is able to draw on the substantial weight of federal authority which treats agreements for the operation of entities like limited partnerships and LLCs as executory contracts when those agreements contemplate an important, on-going role for the debtor in management.[28] For purposes of their motion for summary judgment, the plaintiffs have elected to assume that the LLC Agreement is an executory contract and I therefore consider that concession to settle the question.[29]

According to PDC, § 365(e)(1) embodies Congress's intent that ipso facto clauses like the one in the LLC Agreement be preempted. That is especially so, says PDC, because § 349 of the Bankruptcy Code states:

(b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

---

26. 11 U.S.C. § 541(c)(1).

27. 11 U.S.C. § 365.

28. A great deal of case law holds that, as a general matter, partnership agreements are executory contracts. See, e.g., In re Sunset Developers, 69 B.R. 710, 712 (Bankr.D.Idaho 1987) (holding that a partnership agreement imposing ongoing mutual obligations is an executory agreement); In re Catron, 158 B.R. 629, 634 (E.D.Va.1993) (assuming that a partnership agreement is an executory contract, noting that this position has been followed by the majority of cases); In re Cutler, 165 B.R. 275, 280–281 (Bankr.D.Ariz.1994) ("The courts have generally assumed that partnership agreements are, at least in part, executory contracts."). Case law holding that LLC agreements are executory contracts is less abundant, however, the trend seems to be that LLC agreements are being treated the same

as partnership agreements in most cases. See Matter of Daugherty Const., Inc., 188 B.R. 607, 612 (Bankr.D.Neb.1995) (concluding that an LLC agreement is an executory contract); In re DeLuca, 194 B.R. 65, 77 (Bankr. E.D.Va.1996) (concluding that an LLC agreement is an executory contract where parties had ongoing duties and responsibilities). But see In re Garrison–Ashburn, L.C., 253 B.R. 700 (Bankr.E.D.Va.2000) (concluding that an LLC agreement is not an executory contract where it merely provides structure for management of a company but imposes no duties or responsibilities on members).

29. The question of whether a typical LLC agreement is an executory contract is not without its own complexities. Here, however, the important managerial role accorded to PDC as a member renders the plaintiffs' concession understandable, given the weight of federal precedent.

\* \* \*

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.[30]

PDC argues that when taken together, §§ 365(e)(1) and 349 establish that its bankruptcy filing must be deemed a non-event and that PDC's membership interest in Milford Power must be the same as it had been *before* the bankruptcy filing. That is, PDC contends that §§ 365(e)(1) and 349 represent a clear statement by Congress that contractual provisions like the Ipso Facto Clause and statutory provisions such as § 18–304(1)(b) of the Delaware LLC Act are preempted. The public policy that supports this preemption, PDC contends, is the desire to ensure that valuable assets of a bankrupt are preserved and can be deployed by the bankrupt estate to meet the claims of creditors. Thus, PDC submits that because the Bankruptcy Court took no action to deprive PDC of its membership interest during the pendency of PDC's Bankruptcy case, that membership interest remained undisturbed and revests in PDC, free and clear from any effect of its bankruptcy filing.

PDC's argument is a colorable one. There is federal precedent that holds that an interest in an alternative entity—even a managing interest in a limited partnership—falls within the protective scope of § 365(e)(1) and that an ipso facto clause may not operate to divest a bankruptcy trustee from assuming that contract.[31] There is also precedent from other states

that indicates that § 365(e)(1) and § 349 preclude the enforcement of an ipso facto clause by a creditor even when the debtor's bankruptcy case has been dismissed and no express order of the Bankruptcy Court precludes enforcement of the clause.[32] That is, this precedent holds that the Bankruptcy Code does not just forestall the enforcement of an ipso facto clause while the debtor is in bankruptcy or when there is a Bankruptcy Court order to that effect but instead operates as an absolute bar to the enforcement of a contract or statutory provision that divests a debtor of an interest in an executory contract simply because the debtor filed for bankruptcy.

As straightforward as PDC's argument might appear at first blush, there is other legal authority that cuts against PDC's argument for preemption. For example, § 365(e)(1) does not apply in certain circumstances to executory contracts, to wit:

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

---

30. 11 U.S.C. § 349.

31. *Summit Investment and Development Corp. v. Leroux*, 69 F.3d 608 (1st Cir.1995).

32. *First Sec. Bank v. Creech*, 858 P.2d 958 (Ut.1993); *Bankers Trust Co. of California v. Fankhanel*, 1998 WL 405024, at *2–3 (Minn. App. Jul 21, 1998) (citing *Creech* as a basis for

holding that, where a bankruptcy case is dismissed, a lease is not automatically rejected as a consequence of having filed for bankruptcy). *See also In re Irons*, 173 B.R. 910, 911 (Bankr.E.D.Ark.1994) (stating that dismissal of a bankruptcy case negates prior effects of the bankruptcy petition).

(ii) such party does not consent to such assumption or assignment . . . [33]

Another subsection of § 365 also touches on this issue, and states in key part that:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment; [34]

These sections, taken together, bear on this case because they express a federal policy limitation on the Bankruptcy Code's invalidation of ipso facto clauses. In essence, § 365(e)(2) and § 365(c)(1) (taken together, the "Assumability Exceptions") are an expression of Congress's recognition that certain types of executory contracts to which debtors are parties (e.g., personal services contracts) should not be assumable by a Bankruptcy Trustee in circumstances when state law would not require the non-debtor parties to accept substitute performance. In the case of an LP or LLC agreement that makes the debtor-partner or member a key part of the entity's management on a going-forward basis, there is, as we shall see, a strong argument that these sections preclude a Bankruptcy Trustee from assuming at least those aspects of the contract granting the debtor managerial rights

even if the Trustee is the debtor in possession—i.e., when the debtor itself is in charge of the bankrupt estate.

The plaintiffs have chosen not to dilate on the ramifications of the Assumability Exceptions to the Bankruptcy Code's anti-ipso facto clause provisions, preferring to rely upon a strand of state law authority. This authority comes from state courts that have addressed the question of what effect §§ 541, 365, and 349 of the Bankruptcy Code have on the enforceability of contractual ipso facto clauses against a debtor whose bankruptcy filing is dismissed without any order of the bankruptcy court addressing whether the clause can be enforced after the dismissal.

In *Miller v. Parlor Furniture of Hickory, Inc.*, a lease contained an ipso facto clause triggered by the filing of a bankruptcy petition. The debtor's bankruptcy case was dismissed and the lessor sought to terminate the lease in reliance upon the ipso facto clause. The North Carolina Court of Appeals held that the lessor could terminate, stating:

In rendering "ipso facto" or bankruptcy termination clauses unenforceable pursuant to 11 U.S.C. § 365(e)(1), "Congress meant to foster the process by which a trustee or a Chapter 11 debtor in possession could assume a lease so that it could 'be utilized to assist in the debtor's rehabilitation or liquidation.'" (citation omitted). *In re National Shoes, Inc.*, 20 B.R. 55, 9 Bankr.Ct.Dec. (CRR) 11, 20 B.R. (West) 55 (Bankr. S.D.N.Y.1982). This purpose is apparent from other provisions of the statute giving the trustee of the debtor the right, upon court approval, to assume or reject unexpired leases, 11 U.S.C. § 365(a); and to assign such a lease notwithstanding a provision therein re-

33. 11 U.S.C. § 365(e)(2).

34. 11 U.S.C. § 365(c)(1).

stricting assignments, 11 U.S.C. § 365(f). However, where the bankruptcy case is dismissed for failure of the debtor to comply with orders of the bankruptcy court, there no longer exists any reason to benefit the debtor or preserve the assets of the bankrupt estate by prohibiting enforcement of an otherwise valid bankruptcy termination clause. Such clauses "are not invalidated in toto, but are merely made inapplicable during the case for the purposes of dealing with the ... unexpired lease." Plaintiffs allege, and the record indicates, that defendant's Chapter 11 proceeding was dismissed by the bankruptcy court. The effect of a dismissal is to "undo the title 11 case in so far as is practicable, and to restore all property rights to the position they occupied at the beginning of the case." 2 Collier on Bankruptcy ¶ 349.01, at 349–2 (15th ed.1985) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 338 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 48 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787). Thus, the dismissal of defendant's bankruptcy proceeding without any adjudication returned the parties to the same status which they had before the commencement of the case and the protection from the bankruptcy termination clause, afforded defendant under 11 U.S.C. § 365(e)(1), was lost. Accordingly, we hold that the provisions of 11 U.S.C. § 365(e)(1) do not prevent plaintiffs from maintaining the present action.[35]

*Miller* is important, here, say the plaintiffs, because its reasoning was relied upon by our Superior Court in *Chrysler Financial Corp. v. Fruit of the Loom, Inc.*[36] In that case, the court decided that a lessee that had consented to an involuntary bankruptcy filing had defaulted on a lease governed by Texas law because that filing triggered the lease's ipso facto clause. Because the lessee's bankruptcy case was dismissed and the lessee was no longer under the protection of the bankruptcy court, Judge Bifferato justified his conclusion thusly:

> Thus, it is apparent from the Bankruptcy Code, the legislative history and the case law that although ipso facto clauses are unenforceable in bankruptcy, they are enforceable outside of bankruptcy. The goal of the Bankruptcy Code is to allow debtors a chance to have a fresh start. Allowing lessors to terminate the bankrupt lessee's lease immediately upon filing for bankruptcy protection would defeat this purpose. The same goal, however, is not achieved when the ipso facto clause is sought to be enforced against a non-bankrupt lessee, which is not entitled to the same protection under the Bankruptcy Code. A non-bankrupt lessee would have to seek protection under state contract law; no such Texas authority has been presented. The Leases provide that bankruptcy of one of the lessees is an event of default. The language is not ambiguous and it is clear that this was the intent of the parties. When [the tenant] entered bankruptcy, Plaintiffs were properly able to allege default under the Leases and seek a remedy.[37]

Earlier in his opinion, Judge Bifferato cited to legislative history regarding § 365, which he read as supporting the result he reached. That history indicates that § 365(e)(1) "does not limit the application of an ipso facto or bankruptcy clause if a

---

**35.** 79 N.C.App. 639, 339 S.E.2d 804, 805–06 (1986) (emphasis omitted).

**36.** 1993 WL 19659 (Del.Super.Jan.12, 1993).

**37.** *Id.* at *4.

new insolvency or receivership occurs after the bankruptcy is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of disposition of the ... unexpired lease." [38]

The plaintiffs argue that I can simply follow the teaching of *Chrysler Financial* and ignore the Bankruptcy Code altogether, as being completely irrelevant to this case. As I am not convinced that this is so, I will outline the alternative rationale that, in my view, better justifies the entry of (an albeit more limited) summary judgment order for the plaintiffs. That rationale is grounded in the Assumability Exceptions.

Arguably, the Delaware LLC Act excuses Milford Holdings from accepting performance from a trustee or assignee. For one thing, § 18–304 represents a default rule of Delaware public policy that expresses the view that, absent a contractual provision to the contrary, members of a Delaware LLC need not fear that they will have as fellow members bankruptcy trustees or assigns of bankruptcy trustees. That is, § 18–304 expressly recognizes the unique relationships that exist among members of LLCs and protects solvent members from being forced into relationships they did not choose that result from the bankruptcy of one of their chosen co-investors. Likewise, other provisions of the LLC Act that provide that assignees of membership interests be denied any right to participate as a member in the governance of the entity, absent a provision in an LLC agreement to the contrary [39] also constitute applicable law that excuses a solvent member from accepting substitute performance as a member from a Bankruptcy Trustee or an assignee of a Bankruptcy Trustee.

There are, of course, sound economic reasons why Delaware law, like that of many other states, embraces a default rule that terminates an LLC member's interest upon a bankruptcy filing. Typically, LLCs are closely held and the members often have important managerial duties and powerful voting rights. The Milford Power LLC Agreement is no exception; PDC's 5% interest gave it a seat on every important management committee and voting rights that enabled it to veto a range of significant business transactions. In a lucid article, Professor Ribstein has persuasively explained the rational reasons why investors in alternative entities would agree in advance to forsake their ownership interest upon filing bankruptcy because, by doing so, they insulate themselves from the economic harm that might result to them if one of their co-venturers files for bankruptcy. [40] The harms than can result include having a co-venturer with important power over the entity, whose economic incentives are distorted by its insolvency, push to liquidate the venture or to take other short-term measures that are beneficial to it as a debtor but detrimental to the venture as a whole and its other investors. [41] Notably, Professor Ribstein also points out that investors are free to structure LLC agreements that do not divest members of their interests upon bankruptcy and that creditors are well-positioned to protect themselves in their dealing with investors in LLCs through

---

**38.** *Id.* at *3 (quoting 11 U.S.C. § 365 note (Notes of Comm. on the Judiciary S.Rep. No. 95–989)).

**39.** *See, e.g.,* 6 *Del. C.* §§ 18–702, 18–704.

**40.** Larry E. Ribstein, *Partner Bankruptcy And The Federalization Of Partnership Law,* 33 Wake Forest L.Rev. 795 (1998).

**41.** *Id.* at 800.

contract.[42] For these and other reasons, Professor Ribstein contends that the confusing and ambiguous language in § 365(e)(1) should not be construed as preempting ipso facto clauses in limited partnership agreements, and it is fair to say that his arguments as to limited partnerships apply with full force to LLCs.

At the same time, thoughtful commentators hold views in stark contrast to Professor Ribstein's. For example, the National Bankruptcy Reform Commission, which was established by Congress, recommended that "[i]pso facto provisions relating to partnerships, LLCs, and the rights or interests of partners or LLC members should not be enforceable under the Bankruptcy Code." [43] The Commission's recommendations to clarify this aspect of federal law were not adopted. Its recommendations, however, are echoed in the holdings of several federal court decisions. At a bare minimum, the Commission's view rests on the not-insensible notion that a debtor ought not be deprived of a valuable interest simply because it has made a bankruptcy filing, especially if that interest is a purely economic interest in the relevant alternative entity.

As I have noted, the federal case law interpreting § 365 of the Bankruptcy Code is confusing and in conflict, leaving the questions of whether, and to what extent, ipso facto clauses in alternative entity agreements are preempted less than clearly answered. Some federal courts, such as the United States Court of Appeals for the First Circuit, have read § 365(e)(1)'s invalidation of ipso facto clauses broadly and the Assumability Exceptions narrowly, even in the context of addressing the assumability of a managing interest in an alternative entity.[44] On the other hand, several federal courts have issued decisions that interpret the Bankruptcy Code in a manner more sympathetic to Professor Ribstein's position and more in keeping with Delaware public policy. These decisions have read the Assumability Exceptions in a literal manner, construing them as plainly stating that "a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party." [45] These holdings have

---

42. *Id.* at 817.

43. National Bankruptcy Review Commission, *National Bankruptcy Review Commission Final Report, Bankruptcy: The Next Twenty Years,* § 2.3.22 at 432 (1997). The National Bankruptcy Review Commission was created by Congress in 1994 and charged with the task of reviewing the Bankruptcy Code and making recommendations based on issues being debated in the bankruptcy community at the time. The Commission's final report, presented in 1997, seems to base its recommendation that ipso facto clauses remain unenforceable under the Code on the need to balance creditor interests without favoring certain creditors over others.

44. *See Summit Inv. and Development Corp. v. Leroux,* 69 F.3d 608 (1st Cir.1995). *See also In re Corky Foods Corp.,* 85 B.R. 903, 904

(S.D.Fla.1988) ("the [Bankruptcy] Code expressly prohibits the de facto dissolution of a partnership under the Uniform Partnership Act merely because a partner of the partnership files for bankruptcy"); *In re Rittenhouse Carpet, Inc.,* 56 B.R. 131, 131–132 (Bankr. E.D.Pa.1985) ("On the basis of § 365(e) and the Supremacy Clause of the U.S. Constitution, we conclude that removal of a debtor/partner may not be predicated merely on the filing of a petition in bankruptcy, notwithstanding provisions of state law to the contrary.").

45. *In re Sunterra Corp.,* 361 F.3d 257, 262 n. 8 (4th Cir.2004) (quoting *In re Access Beyond Techs., Inc.,* 237 B.R. 32, 48 (Bankr.D.Del. 1999)). *See also, In re James Cable Partners,* 27 F.3d 534, 537 (11th Cir.1994); *Matter of West Electronics Inc.,* 852 F.2d 79, 83 (3d

read the plain words of the Assumability Exceptions as representing a congressional intent to respect the contract rights of parties when applicable law provides that the parties do not have to accept substitute performance from a third-party without their consent. Notably, the United States Court of Appeals for the Third Circuit and the federal Bankruptcy Court in Delaware adhere to this literal approach.[46]

A law professor could fruitfully spend the next year or so examining the implications that the Bankruptcy Code has on ipso facto clauses in alternative entity agreements. As a state trial judge with many cases to decide, I do not have all year to peer through the muck in search of what will at most be a debatable answer. Rather, I must decide promptly whether the clear law of my state is preempted by federal law.

 Although state trial judges are duty-bound to respect the supremacy of federal law within its expansive sphere and to respect congressional decisions to preempt our law, we are not duty-bound to go out of our way to look for reasons to preempt our own state's law. Nonetheless, the question of whether the Bankruptcy Code preempts the application of the Ipso Facto Clause in the LLC Agreement requires this court to apply with fidelity the preemption principles articulated by the federal courts. Fortunately, the federal courts have been restrained about finding that the Bankruptcy Code's terms preempt state law provisions generally governing the property rights of bankrupt debtors. Although Congress clearly has the power to establish uniform bankruptcy laws throughout the United States, "Congress has [also] generally left the determination of property rights in the assets of a bankrupt's estate to state law."[47] Therefore, in examining whether the Bankruptcy Code preempts state law, the United States Court of Appeals for the Third Circuit has held that the "usual rule is that congressional intent to pre-empt will not be inferred lightly. Pre-emption must be either explicit, or compelled due to an unavoidable conflict between the state law and the federal law."[48]

In keeping with that teaching, I apply a restrained preemption analysis in this case and do not reach out to imagine or exaggerate conflicts between Delaware law and the Bankruptcy Code. On the other hand, I am also duty-bound not to ignore an "explicit" congressional preemption of state law or an "unavoidable conflict" between the Bankruptcy Code and Delaware law.[49]

Cutting to the chase, I do perceive § 18–304 of the Delaware LLC Act (and therefore the Ipso Facto Clause in the Milford Power LLC Agreement) to be preempted to some limited extent. In so ruling, I acknowledge that under the reasoning of *Chrysler Financial Corporation*, the Supe-

---

Cir.1988); *In re Catron*, 158 B.R. 629, 633–638 (E.D.Va.1993); *In re Catapult Entertainment, Inc.*, 165 F.3d 747, 750 (9th Cir.1999). I use some license here so as not to confuse the opinion even more through a separate consideration of cases dealing with § 365(e)(2) as opposed to § 365(c)(1). The debate about their respective meanings is essentially identical in substance.

46. *In re West Elecs., Inc.*, 852 F.2d 79, 83 (3d Cir.1988); *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 48 (Bankr.D.Del.1999).

47. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

48. *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 491–2 (3d Cir. 1997) (quoting *In re Roach*, 824 F.2d 1370, 1373 (3d Cir.1987)).

49. *Id.*

rior Court found that §§ 365 and 541 of the Bankruptcy Code only operate to defang ipso facto clauses while the debtor is actually in Bankruptcy Court and that the federal government has no interest in protecting debtors whose bankruptcy filings are dismissed without a Bankruptcy Court order protecting their interest in executory contracts containing ipso facto clauses.

The problem with that argument, from my perspective, is that it slights the obvious purpose of the Bankruptcy Code in precluding ipso facto clauses from working forfeitures of important economic assets of debtors. Section 349 of the Bankruptcy Code has been construed as extending that protection to a debtor whose case is dismissed. In *First Sec. Bank v. Creech,* the Utah Supreme Court held that, irrespective of a default under an ipso facto clause, debtors whose bankruptcy filing had been dismissed had their interests in the relevant contract restored under § 349 as if the bankruptcy filing had never occurred.[50] In keeping with *Creech,* Professor Erlich has expressed the view that:

> If the case is dismissed, the debtor's interest in any property that had passed to the estate prior to the commencement of the case revests in the debtor the instant before commencement of the case. Thus, the default under the ipso facto clause entailed by the filing of the bankruptcy petition is, by force of law, neutralized.[51]

The plaintiffs argue that § 349 simply means that the debtor gets back the property interest it possessed immediately *be-* *fore* the bankruptcy filing but does not mean that the effect of the bankruptcy filing under state law is preempted. Although Congress gave debtors in the Bankruptcy Courts protection against ipso facto clauses, they noted that § 349 does not explicitly indicate that the anti-ipso facto clause provisions of the Bankruptcy Code continue to preclude enforcement of an ipso facto clause after a dismissal and that there is legislative history that suggests that those provisions only stay enforcement of the ipso facto clause until the Bankruptcy case concludes or unless the Bankruptcy Court expressly overrides the ipso facto clause and vests the property in the estate or a transferee of the estate, free and clear of the clause's operation.[52]

The problem I have with the plaintiffs' argument is that it suggests that Congress's antipathy towards ipso facto clauses was capriciously implemented. So long as a debtor remains in bankruptcy, the Bankruptcy Code neutralizes the effect of an ipso facto clause, thereby enabling the debtor's estate to use the asset subject to forfeiture to satisfy creditor claims. But if a debtor's bankruptcy case is dismissed, the debtor may be stripped of an important economic asset by virtue of the mere fact of filing for bankruptcy without restriction by the combined operation of §§ 365, 541, and 349—a stripping that might in turn lead to the actual insolvency of the debtor. Although the plaintiffs contend that Congress was implicitly exacting a toll on improvident bankruptcy filings by permitting ipso facto clauses to be en-

50. 858 P.2d 958 (Ut.1993).

51. Scott B. Erlich, *The Fourth Opinion of Section 521(2)(A)—Reaffirmation Agreements and Chapter 7 Consumer Debt,* 53 Mercer L.Rev. 613, 686 (2002). *See also* Laurence D. Cherkis, *Recommendations of the National Bankruptcy Review Commission: Partnership as Debtor, Partner as Debtor,* 5 Am. Bankr.

Inst. L.Rev. 381, 395 (1997) (noting the recommendation of the National Bankruptcy Review Commission that ipso facto provisions in all partnership agreements should be rendered unenforceable).

52. *See* H.R.Rep. No. 95–595, at 349 (1977) quoted in note 35, *supra.*

forced after a dismissal, they cite no legislative history suggesting such an intent and there are other aspects of bankruptcy law that serve that purpose expressly.[53] In view of the evident hostility towards ipso facto clauses in §§ 365 and 541, and the language of § 349, I conclude that Congress intended that a debtor whose bankruptcy filing was dismissed should not, when its property interests revest under § 349, be subject to any greater consequences from the operation of an ipso facto clause than it would have been had the relevant contract at issue been addressed within the context of a plan approved by the Bankruptcy Court itself.

As a consequence, I reach a result in this case that is different from either that advocated by PDC or by the plaintiffs. For PDC's part, it wishes me to conclude that the Bankruptcy Code entirely preempts the application of the Ipso Facto Clause and § 18–304 of the Delaware LLC Act. For the plaintiffs' part, they wish me to conclude that the Bankruptcy Code has no preemptive effect at all on the Ipso Facto Clause or § 18–304.

I reach the more nuanced conclusion that an ipso facto clause in an LLC contract retains the same potency after a § 349 dismissal that it would have during the course of a bankruptcy proceeding. In so holding, I reject in an important measure the argument made by PDC. Under PDC's view, a debtor receiving a § 349 dismissal would be in a better position to avoid the effects of an ipso facto clause than a debtor whose bankruptcy filing was not dismissed. To understand what I mean, it is critical to consider the effect of the Assumability Exceptions. Read literally, the Assumability Exceptions expressly state that a bankruptcy estate may not assume an executory contract over the non-debtor's objection if state law would bar assignment of that contract to a hypothetical third party. Being under no duty to search for reasons to conclude that Congress has preempted Delaware law, I approach the relevance of the Assumability Exceptions by accepting the literal interpretation of that section adopted by the United States Court of Appeals for the Third Circuit and several other federal courts of appeal.[54] Under that interpretation, the Assumability Exceptions preclude even a debtor in possession in bankruptcy from accepting an executory contract if state law would preclude assignment of that contract to a hypothetical third party.

Applying this literal approach, the question then becomes whether the Delaware LLC Act excuses the members of Milford Power from accepting performance from an assignee of PDC's membership interest. Put more broadly, does the Delaware LLC Act excuse members of a limited liability company from accepting performance of an LLC agreement from an assignee of another member? Although one would not know it from reading the parties' briefs, this precise question was recently addressed by Judge Farnan of the United States District Court for the District of Delaware in the case of *In re: IT Group, Inc.*[55] In that case, two debtor-members of a Delaware LLC attempted to assign their membership interests to a third party. Another member of the LLC, Northrop, objected to the attempted assignment. It argued that the Delaware LLC Act did not require Northrop to accept performance

---

53. *See, e.g.,* Fed. R. Bankr.P. 9011(c) (permitting imposition of sanctions for bringing frivolous or unwarranted actions in bankruptcy court).

54. *See* cases cited *supra* notes 45–56.

55. 302 B.R. 483 (D.Del.2003) *aff'g In re IT Group, Inc.,* No. 02–10118(MFW), order (Bankr.D. Del. June 20, 2002).

from the debtor-members' assignee and that the ipso facto clause in the relevant LLC agreement was enforceable. In the alternative, Northrop argued that the Delaware LLC Act precluded the debtor-members from assigning anything other than the rights specified in § 18–702(b)(2) of the Delaware LLC Act, which accords an assignee the right to participate in profits and losses of a limited liability company. Moreover, Northrop contended that a provision of the LLC agreement giving members a right of first refusal as to the transfer of any other member's interest was enforceable.

On appeal from the Bankruptcy Court, Judge Farnan held that the Bankruptcy Court was correct in rejecting Northrop's primary argument and embracing its alternative argument.

The Bankruptcy Court held that the debtor-members were barred from transferring their full membership interests because Delaware law excused Northrop from accepting substitute performance. In other words, the Assumability Exceptions operated to exempt the ipso facto clause's force from § 365(e)(1) and to permit the ipso facto clause to deprive the debtor-members of their non-economic rights as members. By contrast, however, the Bankruptcy Court held that the debtor-members could assign their economic interests in the profits and losses of the limited liability company because Delaware law did not excuse Northrop from accepting assignment of these "bare economic rights." To that extent, the ipso facto clause was invalidated by § 365(e)(1) and the debtor-members retained their ongoing right to profits and losses, and could

transfer that interest. In so holding, the Bankruptcy Court rejected Northrop's argument that the debtors were "either in default … or [were] not" under the ipso facto clause and that there was no reason to treat the economic rights of the debtor differently from the rights of the debtor to participate as a full member.[56]

On appeal, Judge Farnan affirmed, stating:

> Under 6 *Del. C.* § 18–702(b)(2), the members of an LLC are permitted to assign their bare economic interests to another entity. In pertinent part, Section § 18–702(b)(2) provides that an assignee is "entitled to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction or credit or similar item to which the [debtor] was entitled." Because the applicable law does not excuse the Members from rendering economic performance to an assignee, the Court concludes that Section 365(e)(2)(A) does not apply and the default provision is unenforceable as an ipso facto provision.[57]

Judge Farnan also upheld the Bankruptcy Court's determination that the debtor-members' right to transfer their bare economic rights was subject to Northrop's right of first refusal. Because the right of refusal existed as to any transfer, whether the transferor was in bankruptcy or not, that property right was to be respected within the bankruptcy process and would not, he reasoned, injure the debtor-members' ability to recoup the full value of their bare economic rights.[58]

---

56. 302 B.R. at 487. Essentially, Judge Farnan affirmed the Bankruptcy Court's separation of the LLC Agreement into its executory and non-executory components, treating the bare economic interest more like a property

right subject to § 541, or so it appears to this non-bankruptcy judge.

57. 302 B.R. at 487.

58. 302 B.R. at 488–489.

Applying the reasoning of Judge Farnan here leads to the conclusion that the Ipso Facto Clause in the Milford Power LLC Agreement is effective to the extent that it deprived PDC of its ability to participate as a member in the governance of Milford Power. Under the Delaware LLC Act, other members of Milford Power are—as a matter of default law—excused from accepting substitute performance of governance rights and duties and therefore the participatory rights of PDC fall outside the reach of § 365(e)(1)'s invalidation of ipso facto clauses. By contrast, under the Delaware LLC Act, the other members of Milford Power are not excused—again, as a matter of default law—from accepting an assignment of PDC's bare economic rights as an equity owner. Thus, after the dismissal of its bankruptcy filing, PDC possessed the same rights as an assignee under § 18-702(b)(2).[59]

Judge Farnan's reasoning balances the competing policy interests at stake. In keeping with § 18-702(b)(3) (and even § 18-304) of the Delaware LLC Act, his ruling respects the default law of this state by refusing to permit a debtor to transfer its right to participate "in the management of the business and affairs" and "exercise any [governance] rights or power of a member" in an LLC absent specific contractual authorization.[60] At the same time, however, he noted that the General Assembly had concluded that the economic rights of a member in an LLC were, as a general matter, freely assignable. In other words, he concluded that Delaware's default law specifically distinguished between those aspects of an LLC Agreement that should not be freely transferable because substitute performance should not be imposed on the other members absent their express consent (i.e., the managerial powers and duties) and those aspects that should be freely transferable (i.e., the passive right to share in profits and losses). This distinction, like those made by federal law, recognizes that it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-manager without consent. The same logic applies when a member of an LLC must remain in a relationship with a member that has filed for bankruptcy. By terminating the bankrupt filer's status as a member with governance rights, the solvent members only have to live with the

59. In federal cases other than *In re: IT Group, Inc.,* courts have also treated the governance and economic interests attached to ownership stakes in alternative entities differently for purposes of determining whether the Trustee could assume the debtor's rights. *See, e.g., In re: O'Connor,* 258 F.3d 392 (5th Cir.2001) (holding that a debtor's partnership interest was subject to Assumability Exceptions but suggesting that his economic interests in the partnership could be transferred under applicable state law and would have been assumable by Trustee if the Trustee had sought to assume that interest); *In re Sunset Developers,* 69 B.R. 710 (Bankr.D.Idaho 1987) (finding management and voting rights in a general partnership unassignable, and thus subject to a contractual ipso facto clause terminating these rights upon bankruptcy filing, but finding economic rights assignable, and exempt from termination through the opera-

tion of a contractual ipso facto clause); *In re DeLuca,* 194 B.R. 65 (Bankr.E.D.Va.1996) (holding that provisions of a limited liability company operating agreement providing for dissolution of the company upon a member's bankruptcy filing but permitting the remaining members to continue business and to elect a new manager are not invalid ipso facto provisions, but that loss of debtor's right to participate in management of an entity did not deprive the debtor of the economic interest in the entity). *See also* Norton on Bankruptcy § 39: 86 at 39–153 (noting that the economic rights of a partner may be generally assigned by a debtor in possession but that assignment of "management rights" is much more "problematic").

60. 18 *Del. C.* § 18–702(b)(3).

bankrupt filer as an assignee with a passive economic interest.

Notably, this distinction is also reflected in the Milford Power LLC Agreement itself. In Article 9.5, the LLC Agreement recognizes that there might be circumstances when the company is required to recognize a transfer that has been accomplished in violation of the procedures of the LLC Agreement itself, e.g., in violation of the first refusal rights granted to other members by Article 9.2. In the circumstance when "the Company is required to recognize such disposition or transfer, the Units so transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Units...." Furthermore, as a general matter, the Milford Power LLC Agreement recognizes that members may have a need to transfer their units, and provides procedures by which transfers may be accomplished. Although the other members must in most situations provide "prior written consent" to a transfer, that consent "cannot be reasonably withheld, conditioned, or delayed." [61]

Of course, I recognize that a reasonable mind could conclude that the outcome I reach is neither incontestably required by the applicable law nor economically optimal. One can argue, as Professor Ribstein, does that state courts should treat the Bankruptcy Code as non-preemptive of ipso facto clauses in non-bankruptcy cases involving limited partnerships and limited liability companies until Congress makes its intent to preempt indisputable. By vindicating the contractual expectations of venturers, he would say, we best promote responsible wealth creation. I respect that view, as it accords with the public policy of my state as expressed in § 18–304 of the Delaware LLC Act. His view, which was

that adopted in *Chrysler Financial,* also has the virtue of being clear: outside of bankruptcy, ipso facto clauses are always enforceable absent a prior federal court order to the contrary.

On the other hand, the position of PDC also has the same virtue of simplicity. If the Bankruptcy Code is read as erasing the effect of a bankruptcy filing upon a § 349 dismissal, then members of limited partnership or LLCs simply have to live with having as a fellow member a person or entity that filed for bankruptcy and had their case dismissed. If the evident intent of Congress is to avoid having the simple fact of a bankruptcy filing work a forfeiture on a debtor's property interests, then state courts should respect that intent and not penalize a debtor whose bankruptcy case is dismissed by subjecting them to a loss of property that they would not have suffered at the hands of a bankruptcy court had their case not been dismissed.

By adhering to the reasoning of Judge Farnan in the *In re: IT* case, I leave the parties with a more complex outcome. By enforcing the Ipso Facto Clause so as to deprive PDC (or a transferee from it) of the ability to exercise the strong participatory rights given to PDC by the LLC Agreement, I recognize the legitimate business justification for § 18–304 and ipso facto clauses modeled on it, a justification well-explained by Professor Ribstein's article on the subject. At the very least, my approach alleviates the concern that members will, because of solvency concerns, interfere with the ability of a limited liability company to pursue risky business strategies that hold the promise for large profits.

But, by recognizing what I perceive to be the preemptive force of the Bankruptcy

**61.** LLC Agreement Art. 9.1.

Code on ipso facto clauses to the extent that they deprive an LLC member of the economic rights set forth in § 18–702(b)(2), I also respect Congress's desire to avoid having property interests of debtors divested simply because the debtors filed for bankruptcy. This desire is not entirely alien to our law, as our courts have often noted that Delaware law does not favor interpretations that result in forfeitures.[62]

That is, the practical effect of my ruling leaves § 18–304 with continued vitality. Essentially, as I have read it, § 18–304 means that a member who files for bankruptcy still ceases to be a member, but becomes an assignee with the economic rights specified in § 18–702(b).

Because I have concluded that the Ipso Facto Clause cannot be applied to deprive PDC of the economic rights of an assignee,[63] I need not determine whether, as the plaintiffs contend, PDC—as a withdrawn member—would have been deprived entirely of its interest in the profits and losses of Milford Power. Although that appears to be the only sensible reading of the LLC Agreement,[64] I need not and do not rest my conclusion on that ground.

Notably, because I have held that PDC continues to possess the economic rights of an assignee in Milford Power, its argument that the doctrine of unclean hands should bar the plaintiffs' claim is further enervated, as nothing in this ruling will deprive PDC of the right to share in the proceeds of any sale of the power plant. Rather, PDC will be deprived of that opportunity only if the Lenders are successful in their foreclosure action or for other circumstances that would not flow directly from this decision.

## VI. *Conclusion*

For all these reasons, the plaintiffs' motion for summary judgment is granted in part. PDC has been divested of its right to participate in the management of Milford Power and only retains the economic rights of a transferee under § 18–702(b)(2). The plaintiffs shall prepare a conforming final order and submit it to me, upon notice to PDC as to form, within twenty days. Each side shall bear its own costs.

---

62. *Cf. Garrett v. Brown*, 1986 WL 6708, at *8 (Del.Ch. Jun 13, 1986) ("Forfeitures are not favored and contracts will be construed to avoid such a result."); *Clements v. Castle Mortg. Service Co.*, 382 A.2d 1367, 1370 (Del. Ch.1977) ("Forfeiture as such is highly disfavored by the courts, including those of Delaware.")

63. Because PDC argued that relevant provisions of the Bankruptcy Code preempted giving any effect at all to the Ipso Facto Clause, I could not avoid the preemption question.

Trust me, I explored how I might accomplish that sidestep.

64. Article 11.9 is difficult to interpret as leaving a Withdrawing Member any right to participate in profit allocations after the event of withdrawal. By its plain terms, a Withdrawing Member has the duty to pay any obligation to the LLC owed by it as of the time of withdrawal, but was, by withdrawing, assigning "all its rights and interests in the Company" to the other members.